[This decision has been published in *Ohio Official Reports* at 94 Ohio St.3d 246.]

THE STATE OF OHIO, APPELLEE, *v.* HERRING, APPELLANT.

[Cite as *State v. Herring*, 2002-Ohio-796.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-904–Submitted July 17, 2001–Decided February 27, 2002.)

APPEAL from the Court of Common Pleas of Mahoning County, No. 96-CR-339.

_____

PFEIFER, J.

{¶ 1} Shortly after midnight on April 30, 1996, five masked gunmen intent on robbery entered the Newport Inn, a bar in Youngstown. They shot five people, robbed the till, and left. Three of the five victims died. One of the gunmen, Willie S. "Stevie" Herring, is the appellant in this case. He was convicted of three counts of aggravated murder and sentenced to death on each count.

{¶ 2} Herring's partners in crime were Adelbert Callahan, Antwan Jones, Eugene Foose, Louis Allen, and Kitwan Dalton. On the night of April 29, 1996, these five gathered at Herring's house. At one point, Callahan and Jones left the house for about fifteen minutes before returning with a stolen van.

{¶ 3} Herring and the others got into the van, Callahan taking the wheel. Callahan drove to a blue house on Laclede Avenue near Hillman Street and Rosedale Avenue. Herring went inside the blue house and came back with four guns. He gave a .38 special to Allen, a 9 mm pistol to Callahan, and a .357-caliber pistol to Jones. He did not give a gun to Foose, who was already carrying a .45, or to Dalton, who was to be the getaway driver. Herring kept a 9 mm Cobray semiautomatic for himself.

{¶ 4} Herring then said to the others, "If you all know like I know, then you all want to get paid." It turned out that all six needed money. They therefore

decided to commit a robbery. Foose suggested the Newport Inn as a target. Callahan drove the van there.

{¶ 5} Everyone but Dalton got out of the van carrying a gun. They put on disguises. Herring donned a white Halloween mask, which Dalton agreed was a "store-bought" mask similar to one seen in "slasher" movies. No one else had such a mask; the others hid their faces with bandanas or, in Allen's case, a T-shirt. Herring, Allen, and Foose went to the back door of the Newport Inn; Callahan and Jones took the front door.

{¶ 6} Ronald Marinelli, the Newport Inn's owner, was tending bar that night. He had six or eight customers, including Deborah Aziz, Herman Naze, Sr., Dennis Kotheimer, and Jimmie Lee Jones. Jones was sitting with a woman at a table in the back.

{¶ 7} Sometime between 1:45 and 2:15 a.m., the robbers burst in. Hearing a sound like a gunshot, Marinelli looked and saw four armed black males in the bar. The two at the front door were disguised in dark bandanas. One carried a revolver; one had what looked to Marinelli like a 9 mm semiautomatic pistol. Marinelli saw two more at the rear. One wore a bandana, the other a "white hockey-type mask." Herring, in the white mask, carried a "very distinctive" gun, which looked like an Uzi or a MAC-10, squarish in shape, with a long clip. Allen, entering last through the back door, saw Jimmie Lee Jones already lying on the floor. At a nearby table, a woman was screaming. Allen told her to be quiet. Then he returned to the van.

{¶ 8} One of the other gunmen ordered Herman Naze: "Give me your fucking money." "I don't have any money," Naze replied. The gunman immediately shot him. Then Herring shot Deborah Aziz, who fell to the floor. She managed to crawl away and hide between a cooler and a trash can. She later described her assailant's mask as "a hard plastic, like one of those Jason masks."

{¶ 9} Now Herring walked around the end of the horseshoe bar toward Marinelli and the cash register. As he approached, he shot Marinelli four times in the stomach from about five feet away.

{¶ 10} Somehow Marinelli managed to stay on his feet as Herring came closer. Herring stopped about a foot away from him. Marinelli noticed his assailant's long reddish-orange hair. Despite the mask, Marinelli could also see that his assailant had an "odd skin pigment," large eyes "almost like a hazel" color, and buckteeth.

{¶ 11} Herring said, "Give me your fucking money." Despite his wounds, Marinelli obeyed, handing over the cash in the register. But the robber screamed that Marinelli hadn't given him everything. He had guessed right: in a nearby drawer there was some cash belonging to a pool league.

{¶ 12} As Herring threatened to "blow [Marinelli's] brains out," Marinelli gave him the money from the drawer. Herring screamed for more. Marinelli urged him to "[b]e cool" and told him there was no more. Herring responded by leveling his gun at Marinelli's head.

{¶ 13} Marinelli reached into the drawer again. This time, he pulled out a gun of his own. But by now, Marinelli was so weak that Herring easily took the gun from him. Marinelli collapsed. Herring said, "You ain't dead yet, motherfucker," and shot Marinelli in the legs as he lay on the floor.

{¶ 14} After Herring shot Marinelli, Aziz heard Dennis Kotheimer say, "You motherfucker." Then she heard more shots. Marinelli saw Kotheimer get shot but did not see who shot him. Nobody saw who shot Jimmie Lee Jones.

{¶ 15} Someone reported the gunshots to the Youngstown police, and officers were sent to the Newport Inn. When the officers saw the carnage inside, they summoned emergency personnel.

**{¶ 16}** The five shooting victims were taken to a Youngstown hospital. Herman Naze and Jimmie Lee Jones were both pronounced dead on the morning of April 30. Dennis Kotheimer died on May 1.

**{¶ 17}** Autopsies showed that each victim died of gunshot wounds to the trunk. Jones had been shot twice; one 9 mm slug was recovered from his body. Kotheimer and Naze had each been shot once, but no bullets were recovered from either victim.

**{¶ 18}** On May 7, 1996, Officer Daniel Mikus responded to a report of an unruly juvenile at 641 West Laclede Avenue. There, Mikus confronted sixteen-year-old Obie Crockett, who was sitting on a couch with his hand concealed under a pillow. Mikus looked under the pillow and found State's Exhibit 5, a 9 mm semiautomatic firearm. A forensic scientist at the Bureau of Criminal Identification and Investigation later determined that State's Exhibit 5 had fired the 9 mm slug recovered from the body of Jimmie Lee Jones.

**{¶ 19}** Herring was indicted on three counts of aggravated murder in violation of R.C. 2903.01(B). Count One charged him with killing Jimmie Lee Jones; Count Two, with killing Herman Naze; Count Three, with killing Dennis Kotheimer. The instructions and verdict forms on Count One gave the jury the option of convicting Herring of the aggravated murder of Jones either as the principal offender or as an accomplice. The indictment also included two counts of attempted aggravated murder in violation of R.C. 2923.02(A), and two counts of aggravated robbery in violation of R.C. 2911.01(A)(1).

**{¶ 20}** Each aggravated murder count originally had two death specifications attached: multiple murder, R.C. 2929.04(A)(5), and felony-murder, R.C. 2929.04(A)(7). Ultimately, the (A)(7) specifications for Counts Two and Three were not submitted to the jury.

**{¶ 21}** On Count One, the jury found Herring not guilty of committing aggravated murder as a principal offender, but guilty of complicity in the

aggravated murder of Jones. The jury also found Herring guilty of the (A)(5) multiple-murder specification to Count One. The jury convicted Herring of all other counts and specifications. After a penalty hearing, the jury recommended death for all three aggravated murders, and the trial judge sentenced Herring to death.

## I. Intent to Kill

{¶ 22} In his first and second propositions of law, Herring contends that faulty instructions on the issue of specific intent to kill invalidate his aggravated-murder convictions.

{¶ 23} Purpose (*i.e.*, intent) to kill is an essential element of aggravated murder. R.C. 2903.01. See, *e.g.*, *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623, 634. Moreover, "[t]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show * * * that the defendant shared the criminal intent of the principal." *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus.

{¶ 24} With respect to Count One (aggravated murder of Jimmie Lee Jones), the trial court gave a standard instruction on specific intent. However, the court then instructed that if the state failed to prove that Herring was the principal offender on Count One, the jury could consider whether he was guilty of complicity. The court instructed: "You may not convict Willie S. Herring of complicity to commit aggravated murder unless you find beyond a reasonable doubt that he specifically intended to aid and abet another in causing the death of Jimmie Lee Jones." On Counts Two (aggravated murder of Herman Naze) and Three (aggravated murder of Dennis Kotheimer), the court gave the same instruction, precluding the jury from convicting Herring of complicity in aggravated murder unless it found that he "specifically intended to aid and abet another in causing the death of" each victim. The court also defined the terms "aid" and "abet" as follows: "Aid means to help, assist or strengthen. Abet means to encourage, counsel, incite

or assist." See 4 Ohio Jury Instructions (2000) 573, Sections 523.03(8) and 523.03(9).

{¶ 25} These instructions, Herring contends, did not sufficiently inform the jury that it could not find him guilty on Counts One, Two, or Three without finding that he specifically intended to kill.

{¶ 26} Where an instruction is claimed to be "ambiguous and therefore subject to an erroneous interpretation," the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction" incorrectly. See *Boyde v. California* (1990), 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329.

{¶ 27} Herring's claim assumes that the jury could have found that he "specifically intended to aid and abet another in causing the death" of another without finding that he specifically intended to cause the death of another. We disagree. It is hard to see how a person could, in the words of the instruction, *intend* to "help, assist, or strengthen" or "encourage, counsel, incite, or assist" another person in causing death, without also intending that the victim die. It is equally hard to see any reasonable likelihood that the jury would understand the instruction as allowing the conviction of a defendant who did *not* intend that the victim die. Thus, the instructions the trial court gave are functionally equivalent to an instruction requiring specific intent to cause death. Herring's first proposition of law is overruled.

{¶ 28} In his second proposition of law, Herring contends that the jury never actually found that he intended to kill Jones, Naze, and Kotheimer. Ordinarily, of course, the guilty verdicts on the aggravated-murder counts would show that the jury did so find. However, Herring contends that due to the allegedly faulty instruction on intent, these verdicts do not reflect an actual jury finding of intent. Rejecting the premise that the instructions were flawed, we reject this claim as well.

{¶ 29} Herring's second proposition of law further contends that the trial judge made an affirmative finding of a lack of intent to kill and that we should accept that finding and reverse his aggravated-murder convictions. But this case was tried to a jury, and it is the jury's verdict that binds us. The jury found that Herring did intend the deaths of Jones, Naze, and Kotheimer.

{¶ 30} Moreover, the trial judge did not, in fact, find that Herring lacked intent to kill. Herring quotes passages from the sentencing opinion stating that "the degree of the defendant's participation in the offense which led to the deaths of Herman  Naze, Sr., Dennis Kotheimer and Jimmie Lee Jones could not be determined and was therefore unclear." But the sentencing opinion did not say that Herring's *state of mind* was unclear or indeterminate; it said that the "degree of his *participation* in the offense" was.

{¶ 31} The opinion goes on to state that "the defendant was the offender (shooter) in the attempt to kill Marinelli and Aziz." In other words, the judge was distinguishing between the shootings in which the degree of Herring's participation was unclear and the shootings in which it was clear that Herring was the principal offender. He was not making any sort of finding as to lack of *mens rea*.

{¶ 32} Herring's second proposition of law lacks merit and is overruled.

## II. Complicity

### A. Bill of Particulars

{¶ 33} The state's second amended bill of particulars alleged that Herring "shot and killed" Jimmie Lee Jones. Thus, the bill specified that Herring was the principal offender in the aggravated murder of Jones. However, at the state's request, and over defense objection, the trial court instructed the jury that it could convict Herring of aggravated murder on Count One if it found that Herring was either the principal offender or an aider and abettor. The jury was given two verdict forms for Count One, reflecting the alternate theories. The jury found Herring not guilty of being the principal offender in the aggravated murder of Jimmie Lee

Jones, but found him guilty of complicity, *i.e.*, of aiding and abetting the aggravated murder of Jones.

**{¶ 34}** In his fourth proposition of law, Herring claims that the jury instruction violated his Sixth Amendment right "to be informed of the nature and cause of the accusation." He contends that, because the bill of particulars indicated that he was the principal offender on Count One, he lacked notice that the trial court would instruct on accomplice liability as to that count.

**{¶ 35}** R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is "stated * * * in terms of the principal offense" and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-408. We reject Herring's Sixth Amendment claim.

**{¶ 36}** Moreover, Crim.R. 33(E)(2) provides that a variance between the allegations and the evidence at trial is not reversible error unless the defense is prejudiced or misled thereby. On the record before us, we cannot conclude that the state's failure to allege complicity in the bill of particulars prejudiced or misled Herring. Herring knew before trial that complicity was an issue with respect to the other aggravated-murder counts. He does not indicate how he could have defended himself differently, given notice that complicity would also be an issue as to Count One. Since Herring does not show prejudice, we overrule his fourth proposition of law.

B. Accomplice Liability for Multiple-Murder Specification

**{¶ 37}** Under R.C. 2929.04(A)(5), an aggravating circumstance exists if "the offense at bar was part of a course of conduct involving the purposeful killing

of or attempt to kill two or more persons *by the offender*." (Emphasis added.) In his third proposition of law, Herring argues that the term "offender" in the (A)(5) multiple-murder specification means the *principal* offender—*i.e.*, the actual killer. He argues that since the jury did not find him to be the actual killer in any of the three murders, he cannot be guilty of this specification.

**{¶ 38}** We reject this contention. As he must, Herring concedes that R.C. 2929.04(A)(5) contains neither an express requirement of prior calculation and design nor an express requirement that the offender be the actual killer. R.C. 2929.04(A)(5) uses the unadorned term "offender," rather than "principal offender." Nor does the term "prior calculation and design" appear therein.

**{¶ 39}** Nevertheless, Herring attempts to read a principal-offender requirement into our precedents. He cites *State v. Smith* (1997), 80 Ohio St.3d 89, 117, 684 N.E.2d 668, 693, and *State v. Sneed* (1992), 63 Ohio St.3d 3, 10-11, 584 N.E.2d 1160, 1168, fn. 3, as supporting his claim. These cases do not support Herring's argument. *Smith* holds that the Eighth Amendment permits a state to sentence to death one who aids and abets a killing with prior calculation and design. It does not hold, or even suggest, that prior calculation and design is *necessary* to convict an aider and abettor of the (A)(5) specification. *Sneed* involved the felony-murder specification of R.C. 2929.04(A)(7), not the (A)(5) multiple-murder specification. Unlike the (A)(5) specification, R.C. 2929.04(A)(7) specifically requires that "either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."

**{¶ 40}** Herring's third proposition of law is overruled.

### III. Sufficiency of Evidence

**{¶ 41}** In his eighth proposition of law, Herring contends that the evidence was legally insufficient to convict him of the three aggravated murders. Chiefly, Herring claims that the state failed to prove that he was the man in the white mask.

**{¶ 42}** When a defendant challenges the legal sufficiency of the state's evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic.*) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

**{¶ 43}** Kitwan Dalton testified that he saw Herring put on a white mask resembling one seen in a "slasher" movie. Allen testified that Herring's mask was the only "store-bought" one worn by any of the robbers. Dalton and Allen testified that the gun Herring carried resembled State's Exhibit 5, the 9 mm semiautomatic with which Jimmie Lee Jones was killed. Dalton claimed that Foose's gun also resembled State's Exhibit 5, but Allen disagreed with this opinion.

**{¶ 44}** Herring argues that the testimony of Dalton and Allen was uncorroborated and should be disbelieved. However, that argument misconceives the nature of the sufficiency inquiry. On review for sufficiency, "[t]he weight and credibility of the evidence are left to the trier of fact." *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " *Jackson v. Virginia*, 443 U.S. at 318-319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573, quoting *Woodby v. Immigration & Naturalization Serv.* (1966), 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362, 367.

**{¶ 45}** In any case, Herring's claim that the accomplice testimony lacked corroboration is incorrect. The testimony of Dalton and Allen was substantially corroborated by the testimony of Marinelli and Aziz. Marinelli testified that a man in a "white hockey-type mask" shot him and Deborah Aziz and robbed the till. He further testified that the shooter was the only one of the robbers who wore a mask instead of a bandana. Aziz testified that the assailant's mask was white and "a hard plastic, like one of those Jason masks." Marinelli described the "very distinctive" gun that the man in the white mask used, which he said looked exactly like State's Exhibit 5. Aziz could not be certain that State's Exhibit 5 was the same gun that the man in the white mask had used, but she did testify that his gun looked like State's Exhibit 5. Finally, Marinelli described the distinctive reddish-orange hair, odd skin tone, and buckteeth of the man in the white mask. Herring has similar features.

**{¶ 46}** Thus, the state presented evidence sufficient, if believed, to show that Herring was the man in the white mask who, on April 30, 1996, robbed the Newport Inn, shot Marinelli and Aziz, and aided and abetted three aggravated murders.

**{¶ 47}** Part F of Herring's eighth proposition of law deals with the issue of purpose to kill. Herring does not argue that the state failed to prove that he intended the deaths of the victims; instead, he reiterates his claim that the *instructions* regarding purpose were inadequate. (See discussion of Herring's first and second propositions of law above.) We continue to reject this claim. Pursuant to R.C. 2929.05(A), we will consider the sufficiency of evidence of purpose to kill as part of our independent review of the death sentence.

**{¶ 48}** Herring's eighth proposition of law is overruled.

IV. Evidentiary Issues

**{¶ 49}** Herring's tenth proposition of law raises two evidentiary issues.

**{¶ 50}** After Marinelli described the visible features of the man in the white mask, including his hair, the prosecutor showed him a photo of Herring. The prosecutor's intention was to ask Marinelli if the gunman's hair and mouth were similar to Herring's, as depicted in the photo. A photo was used because Herring had changed his hairstyle since the crime.

**{¶ 51}** But when the prosecutor asked Marinelli to look at the photo, Marinelli spontaneously said: "I don't have to look at it more than a second. I saw it through my eyes and was shot five times by this guy, and it is him."

**{¶ 52}** The defense moved for a mistrial, arguing that the identification was improper because the circumstances were "unnecessarily suggestive," and because the defense had no advance notice that Marinelli would make a positive identification. See, generally, *United States v. Hill* (C.A.6, 1992), 967 F.2d 226, 232 (admissibility of suggestive in-court identification subject to totality-of-the-circumstances analysis of *Neil v. Biggers* [1972], 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401). The judge denied this motion.

**{¶ 53}** However, before the next witness was called, the judge instructed the jury to disregard that portion of Marinelli's testimony that identified Herring as the man who shot him. The instruction left the jury free to consider "the other comments that Mr. Marinelli made about other physical features of the individual in the photograph, specifically the hair, the eyes, the mouth and pigment * * * for whatever probative value you would give them."

**{¶ 54}** Herring contends that no instruction could cure the prejudice of Marinelli's identification. However, jurors are generally presumed to follow the trial court's instructions, including instructions to disregard testimony. See, *e.g.*, *Garner*, 74 Ohio St.3d at 59, 656 N.E.2d at 634.

{¶ 55} Herring argues that eyewitness identification is unusually difficult to disregard. That may be, but "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, 155. Testimony like this—positively identifying a criminal who was wearing a mask—is not necessarily persuasive, and its impact on the jury is highly uncertain. Moreover, the state did not elicit Marinelli's identification of Herring. Nor did the prosecutors refer to that identification during trial or in argument. See *State v. Zuern* (1987), 32 Ohio St.3d 56, 59, 512 N.E.2d 585, 588.

{¶ 56} As we said in *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9, "[m]istrials need be declared only when * * * a fair trial is no longer possible." We conclude that Marinelli's remark did not render a fair trial impossible. Therefore, no mistrial was necessary.

{¶ 57} Herring also complains that the trial judge excluded a proffered demonstrative exhibit. The defense recalled Deborah Aziz to the witness stand and showed her Defense Exhibit 1, a toy hockey goalie's mask. Aziz testified that the mask "has some similarities" to the white mask worn by the man who shot her and Marinelli. She also testified that Defense Exhibit 1 was wider than the gunman's mask, that the mouth was different, and that the other mask "didn't have holes all over."

{¶ 58} A trial court's ruling on a demonstrative exhibit is reviewed under the abuse-of-discretion standard. *State v. Palmer* (1997), 80 Ohio St.3d 543, 566, 687 N.E.2d 685, 705. "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. "[W]hen applying this standard, an appellate court is not free to substitute its judgment for that of the

trial judge." *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308.

**{¶ 59}** We hold that the trial court did not abuse its discretion in excluding the mask. The differences between the two masks directly undermined the claimed relevance of the exhibit. The defense wanted to use the mask to show that Marinelli could not have seen as much of the shooter's features as he claimed. But since the exhibit was wider and had a different mouth, it is doubtful whether the exhibit could give the jury an accurate idea of how much Marinelli could see. We therefore cannot say that its exclusion was "unreasonable, arbitrary or unconscionable." Compare *Palmer*, 80 Ohio St.3d at 566, 687 N.E.2d at 705 (trial court did not abuse discretion by admitting, for demonstrative purposes, a gun that belonged to the defendant, was "a match" for missing murder weapon, and was similar to the actual murder weapon with respect to specific feature being demonstrated).

**{¶ 60}** Herring's tenth proposition of law is overruled.

## V. Jury Issues

### A. *Batson* Issue

**{¶ 61}** In his sixth proposition of law, Herring claims that the prosecutor peremptorily challenged a black prospective juror because of her race, which if true would violate the Equal Protection Clause. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, the trial court concluded that the prosecutor had not engaged in racial discrimination.

**{¶ 62}** A court decides a *Batson* claim in three steps. First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. Second, if the trial court finds that the opponent has fulfilled this requirement, then the proponent of the strike must come forward with a racially neutral explanation for the strike. *Id.* at 96-98, 106 S.Ct. at 1723-1724, 90 L.E.2d at 87-89. The "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

**{¶ 63}** Third, if the proponent puts forward a racially neutral explanation, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved purposeful racial discrimination. *Id.* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88-89; *Purkett v. Elem* (1995), 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834, 839; *State v. White* (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140, 147. The burden of persuasion is on the opponent of the strike. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839.

**{¶ 64}** The original venire had included twenty-six black veniremembers, but only three were left after challenges for cause. The state peremptorily challenged two of those three, using one-third of its six challenges on black veniremembers, resulting in an all-white jury. The trial court overruled a defense *Batson* objection to these strikes.

**{¶ 65}** However, the original jury was later discharged for an unrelated reason, and a new venire was called. In the second venire, after challenges for cause, two of the thirty-two remaining veniremembers were black. This time, the state used only three peremptories. One was used to remove a black veniremember. The state also waived peremptories with one black left on the venire. As a result, although the jury was all white, one of the alternate jurors was black.

**{¶ 66}** The trial court found that the defense had made a prima facie case (a ruling the state does not challenge) and required the prosecutor to explain why he struck the black venireman.

**{¶ 67}** The prosecutor gave several racially neutral reasons for striking the juror. First, he regarded her as "not too bright," inasmuch as "[h]er hobbies are eating, doing hair and watching Oprah." (The prosecutor's statements about the juror's hobbies and background appear to be based on the jury questionnaire. The questionnaire is not in the record, but the trial judge reviewed it in ruling on the *Batson* objection.) Second, he believed that the juror "flouts society's conventions." He noted that "[s]he had her first child at 16. She's had three

children, no husbands." He also believed that she was a transient because "[s]he lives at one of the missions" and "[i]t took your [the court's] office three days to find" her. Third, the prosecutor considered the juror "soft on the death penalty" based on her voir dire and her jury questionnaire, in which "she checked a block where there are no crimes" that warrant the death penalty.

{¶ 68} The trial court found that the defense had not proved that the prosecutor had excused the veniremember because of her race. He accordingly overruled the *Batson* objection and dismissed her. The finding of the trial court, because it turns largely on the evaluation of credibility, is entitled to deference on appeal and will not be reversed unless clearly erroneous. *White*, *supra*, 85 Ohio St.3d at 437, 709 N.E.2d at 148, quoting *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21; *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, 1314.

{¶ 69} The prosecutor's belief that the prospective juror was "soft on the death penalty" has support in the record. The juror stated: "I don't think I could" vote to recommend death. She later said, "I have no reason not to" abide by the judge's instructions. Nevertheless, her initial response "certainly indicated some degree of opposition to capital punishment," and "it is highly likely that such an attitude made her undesirable to the prosecution." *State v. Murphy* (2001), 91 Ohio St.3d 516, 529, 747 N.E.2d 765, 786.

{¶ 70} Herring contends that "there were a suspiciously low number of minorities available on the panel." Even if true, that contention throws no light on whether the prosecutor committed purposeful discrimination.

{¶ 71} Herring contends that the state's *waiver* of four peremptories, with one black remaining on the venire, supported an inference that the prosecutor was trying to keep blacks off the jury. The argument, while not entirely clear, seems to be that the black veniremember could have been on the jury only if the state had

used all four of its remaining peremptories on other jurors. Even if the record supported this claim, it provides no reason to infer purposeful discrimination.

{¶ 72} The evidence Herring relies upon to support his discrimination claim fails to demonstrate that the trial court's finding, under the totality of the circumstances, was clearly erroneous. Accordingly, Herring's sixth proposition of law is overruled.

B. Fair Cross-Section

{¶ 73} The judges of the Mahoning County Common Pleas Court have authorized the jury commissioner of that court to grant citizens' requests to be excused from jury duty, applying the criteria set forth in R.C. 2313.16(A) through (E). The jury commissioner granted a number of such requests in this case. He kept a list of prospective jurors whom he excused, on which he recorded the excuse given by each prospective juror. He did not record the race of any excused juror.

{¶ 74} In his seventh proposition of law, Herring contends that the jury commissioner violated the Constitution by failing to record the race of prospective jurors excused from service. Herring contends that underrepresentation of blacks on the venire violated his constitutional right to "a jury drawn from a fair cross[-]section of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690, 696. To demonstrate the alleged violation, Herring needed to show at trial that the jury selection process systematically excluded members of a distinctive group. See *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587; *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus. Herring contends that the jury commissioner therefore had a constitutional obligation to record the race of those he excused from jury duty.

{¶ 75} Herring cites no authority requiring the jury commissioner to record such information in order to facilitate a fair-cross-section challenge. Nor does he explain why his counsel could not have learned the race of the excused jurors

17

through investigation.  The record shows that they had access to the venire list—which included the addresses of prospective jurors—and to the list of jurors excused by the commissioner.  Herring's seventh proposition of law is overruled.

## C. Outside Contact with Juror

**{¶ 76}** In his ninth proposition of law, Herring maintains that he was denied due process because a juror received harassing phone calls during the penalty phase.  Someone using the name "Antwan," apparently calling from a correctional facility, telephoned Juror No. 9 at home.  (It was not established whether the caller was Antwan Jones.)  After the jury returned its sentencing recommendation and was discharged, the juror received more calls, prompting her to report the incidents to the trial court's bailiff.

**{¶ 77}** The trial court convened a *Remmer* hearing to determine whether the calls had biased the juror.  See *Remmer v. United States* (1954), 347 U.S. 227, 229-230, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656; *Smith v. Phillips* (1982), 455 U.S. 209, 215-216, 102 S.Ct. 940, 945, 71 L.Ed.2d 78, 84; *State v. Phillips* (1995), 74 Ohio St.3d 72, 88, 656 N.E.2d 643, 661-662.  At the hearing, Juror No. 9 testified that when she got home after the February 12 court session, there was a message on her answering machine about accepting the charges on a collect call.

**{¶ 78}** Later she received a call from someone using the name "Antwan." "Antwan" refused to give his last name but told the juror "his whole life history" and tried to get personal information from her.  Then another person, identified as "Mark," got on the line and asked the juror whether she engaged in "kinky sex."  At this point, the juror hung up.  The caller did not mention the case.

**{¶ 79}** Juror No. 9 mentioned the calls in two conversations with fellow jurors.  Accordingly, the trial judge questioned each juror regarding what the jurors had been told about the calls and how the jurors had reacted to this information.

**{¶ 80}** One of Juror No. 9's conversations took place as she carpooled to the courthouse with Juror No. 12.  The second took place in the jury room during a

break in the trial, as Juror No. 9 chatted with three other jurors and an alternate. Two other jurors overheard bits of the jury-room conversation.

{¶ 81} Juror No. 9 told the others that the caller was named "Antwan" and that he had called from a correctional facility. She also told them that she did not think the calls were related to the case. It did occur to her and the other jurors that "Antwan" might be Herring's accomplice Jones, and one juror suggested that Juror No. 9 report the incident. However, another juror testified: "I don't think we thought of it as a possibility, that it could actually be him."

{¶ 82} Juror No. 9 testified that she "didn't really think it was a big deal." On the other hand, Juror No. 9 told other jurors that she was "a little worried." One juror described Juror No. 9 as "concerned" and "cautious"; another thought she was "upset" and "very scared."

{¶ 83} Juror No. 9 testified that the incident did not affect her impartiality. Likewise, the jurors who heard her mention the incident testified that their impartiality was not affected. One juror admitted being concerned but also stated that she "didn't think about" the incident.

{¶ 84} After the hearing, the defense moved for a mistrial. The trial court denied the motion, basing his decision on his evaluation of the jurors' credibility. "In cases involving outside influences on jurors, trial courts are granted broad discretion in * * * determining whether to declare a mistrial." *State v. Phillips*, 74 Ohio St.3d at 89, 656 N.E.2d at 661. Accord *State v. Keith* (1997), 79 Ohio St.3d 514, 526-527, 684 N.E.2d 47, 60. The decision depends on "how the jury interprets and expectably will react to the communication." *United States v. Williams* (C.A.D.C.1987), 822 F.2d 1174, 1189. The complaining party must show actual prejudice, see, generally, Crim.R. 33(A), *i.e.*, he must show that the communication biased one or more jurors. See *Keith*, 79 Ohio St.3d at 526, 684 N.E.2d at 60, citing *State v. Phillips*, 74 Ohio St.3d at 88-89, 656 N.E.2d at 661. See, also, *Smith v.*

*Phillips*, 455 U.S. at 215-217, 102 S.Ct. at 945-946, 71 L.Ed.2d at 85-86; *United States v. Zelinka* (C.A.6, 1988), 862 F.2d 92, 95-96.

**{¶ 85}** Herring argues that we should reject the trial court's finding that the calls did not affect the jurors' impartiality. However, the record supports the trial court's finding. Each juror testified that the incident did not affect his or her verdict. A trial court may rely upon a juror's testimony as a basis for finding that her impartiality was not affected. *Smith v. Phillips*, *supra*, 455 U.S. at 217, 102 S.Ct. at 946, 71 L.Ed.2d at 86, fn. 7; *Zelinka*, 862 F.2d at 95-96.

**{¶ 86}** Moreover, the objective facts support the jurors' testimony that they were not affected. The caller never mentioned the case, nor did he identify himself as Antwan Jones. The jurors do not appear to have believed that Jones was in fact the caller. The calls themselves, as offensive as they were, were not "so inflammatory that they foster an almost conclusive presumption of prejudice." *Williams*, *supra*, 822 F.2d at 1189.

**{¶ 87}** Finding no abuse of discretion by the trial court, we overrule Herring's ninth proposition of law.

### D. Judge's Communication with Jury

**{¶ 88}** During its guilt-phase deliberations, the jury submitted written questions to the trial court. On two occasions, the judge entered the jury room, with both counsel but without Herring, to respond. Two questions concerned the content of trial testimony; the judge told the jury to rely on its own collective memory. Two questions were requests for items that had not been admitted into evidence; the judge refused to supply the items. (The judge's only response to the fifth question was to say, "[W]e'll address those [issues] in the morning." The next day, the judge responded to that question in open court, with Herring present.)

**{¶ 89}** In his thirteenth proposition of law, Herring contends that it was prejudicial error for the trial judge to communicate with the jury in his absence. Indeed, we have repeatedly held that a trial judge may not do so. See *State v.*

*Abrams* (1974), 39 Ohio St.2d 53, 68 O.O.2d 30, 313 N.E.2d 823; *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph four of the syllabus.

{¶ 90} However, we have also held that, if the communication is not substantive, the error is harmless. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 236-237, 15 OBR 311, 373-374, 473 N.E.2d 264, 324; *State v. Allen* (1995), 73 Ohio St.3d 626, 630, 653 N.E.2d 675, 682. The trial court's responses to the jury's questions were not substantive. Moreover, Herring's counsel were present. See *State v. Taylor* (1997), 78 Ohio St.3d 15, 25-26, 676 N.E.2d 82, 93. Thus, while the judge erred by answering the questions during Herring's absence, the error was harmless. Herring's thirteenth proposition of law is overruled.

VI. Prosecutorial Misconduct

{¶ 91} In his eleventh proposition of law, Herring alleges three instances of prosecutorial misconduct.

{¶ 92} 1. The prosecutor asked Officer Mikus on cross-examination whether Obie Crockett "was in the gun rental business." Upon objection, the trial court ordered the jury to disregard the question and answer. In closing argument, the prosecutor referred to Crockett's house as "Guns R Us." Herring argues that this reference went beyond the evidence by implying that Crockett was a gun dealer and that that was the reason he was found with the murder weapon, and not because he was the one who had used it in the robbery. However, the evidence showed that Herring obtained a variety of guns from a house on Laclede Avenue—inferably Crockett's, since that was where police found the murder gun. This provided factual support for the "Guns R Us" comment.

{¶ 93} 2. Herring accuses the prosecutor of improperly vouching for two of his witnesses, Kitwan Dalton and Louis Allen. During closing arguments, the prosecutor said that Dalton did not lie in a videotaped statement to police the day after the murders and that Allen had lied to police but only about his own involvement.

**{¶ 94}** The prosecutor's statements were based on the trial testimony, not on his personal evaluation of credibility. Dalton testified that on the day after the murders he gave the police a videotaped statement. Dalton testified that this statement was truthful and voluntary, that he had no agreement with the state at that time, and that the police had promised him nothing. Thus, when the prosecutor said that Dalton did not lie in the videotaped statement, he was not vouching for Dalton's testimony; he was simply repeating it.

**{¶ 95}** Similarly, the prosecutor explicitly based his reference to Allen upon Allen's testimony. The prosecutor said: "[A]s Louis Allen told you, the only thing he lied about was himself. He told them he didn't go into the bar, and he didn't have a gun. He didn't lie about the rest of them. He didn't lie about this guy. * * * And he said that." This assertion did not ask the jury to rely on the prosecutor's opinion of Allen's credibility.

**{¶ 96}** 3. Finally, Herring argues that the prosecutor improperly vouched for Dalton and Allen by stating, in response to defense arguments, that he "told them if they don't tell the truth they got no deal, they've got to go to prison." But Herring did not object, so the issue is waived. See *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646, 657.

**{¶ 97}** Herring's eleventh proposition of law is overruled.

## VII. Ineffective Assistance of Counsel

{¶ 98} In his fifteenth proposition of law, Herring claims ineffective assistance of counsel. To establish ineffective assistance, a defendant must show that, in light of all the circumstances, counsel fell below an objective standard of reasonable representation and that but for his unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the result. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; see, also, *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

### A. Guilt Phase

{¶ 99} Herring contends that his counsel should have objected to instructions on purpose and reasonable doubt. However, these objections were unsupported by existing law. See *State v. Phillips*, *supra*, 74 Ohio St.3d at 100, 656 N.E.2d at 668; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. Declining to present rejected legal theories is not ineffective assistance. See *State v. McNeill* (1998), 83 Ohio St.3d 438, 448-449, 700 N.E.2d 596, 607.

{¶ 100} Herring further contends that counsel should have objected to the instruction on foreseeability. However, Herring was not prejudiced by his counsel's failure to object, since the instructions as a whole required the jury to find purpose to kill in order to convict. (See discussion of Herring's second proposition of law above.)

{¶ 101} Herring was also not prejudiced by counsel's failure to insist on his presence when the judge gave nonsubstantive responses to jury questions because there is no reasonable likelihood that the result of the trial would have been different had Herring been present.

{¶ 102} Herring contends that counsel should have objected to more of the prosecutorial misconduct alleged in his eleventh proposition of law, but there were no grounds to object.

{¶ 103} Herring contends that counsel should not have called Officer Mikus to testify about finding the murder weapon in Obie Crockett's possession. He contends that this merely helped the state in "tying up loose ends" by corroborating the testimony of Allen and Dalton that Herring got guns at a house on Laclede Avenue. However, the record does not demonstrate that counsel committed an unprofessional error by calling Mikus to the stand. Evidence that a murder weapon was found in the possession of someone other than the defendant could reasonably be considered favorable to the defense. Moreover, using that evidence gave counsel an opening to attack the police investigation as inadequate because of failure to investigate Crockett's possible role in the crime. Calling Mikus to testify about Crockett's possession of the murder weapon appears to have been a reasonable tactical choice that did not fall below an objective standard of reasonable representation.

B. Penalty Phase

{¶ 104} Because Herring's attorneys called only two witnesses in the penalty phase, Herring speculates that they must have failed to conduct an adequate investigation into mitigating factors. However, the record before us does not show how extensive counsel's investigation actually was, nor does it show that more investigation would have developed anything useful.

{¶ 105} Herring contends that counsel should have objected to "the trial court's instruction that required the jury to unanimously determine the appropriateness of a death sentence before the jury was allowed to consider life-sentencing options." However, the trial court never gave any such instruction.

{¶ 106} Herring further contends that his attorneys should have made other objections to the instructions. However, he fails to demonstrate a reasonable

likelihood that the penalty-phase outcome would have been otherwise had he made the objections.

**{¶ 107}** Finally, Herring contends that his counsel should have objected to the victim-impact statements of Marinelli and Aziz. But these statements (see discussion of sixteenth proposition of law below) were heard only by the judge, and nothing in the record indicates that he considered them in sentencing Herring to death. Consequently, counsel's failure to object was not prejudicial within the meaning of *Strickland*. See *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

**{¶ 108}** Herring's fifteenth proposition of law is overruled.

## VIII. Sentencing

### A. Sentencing Disparity Among Accomplices

**{¶ 109}** In his twelfth proposition of law, Herring contends that the noncapital sentences imposed on his accomplices were relevant in mitigation and that the trial judge therefore violated the Eighth Amendment when he ruled that evidence inadmissible.

**{¶ 110}** Before the penalty phase, the defense informed the court of its intention to introduce Defense Mitigation Exhibits 1 through 17, a series of documents pertaining to the sentences given to his accomplices Callahan, Foose, and Jones. The state objected to these exhibits on the ground that they were not relevant to mitigation, and the trial court ruled them inadmissible. The defense proffered them into the record.

**{¶ 111}** Subsequently, the parties agreed on the admissibility of the exhibits. The state withdrew its objection to introducing the sentences received by Jones and Callahan. Furthermore, since the jury already knew about the plea bargains that Dalton and Allen had entered into, the state agreed that the defense closing argument could address the sentences received by Dalton and Allen.

**{¶ 112}** The defense agreed not to offer evidence about Foose's sentence and to withdraw its proffered exhibits, except for Defense Mitigation Exhibits 3 (jury verdict finding Jones guilty), 4 (judgment entry showing Jones's sentences), and 9 (judgment entry showing Callahan's guilty pleas and sentences). Finally, Assistant Prosecutor Timothy Franken was permitted to testify and explain why Herring's accomplices had not received the death penalty.

**{¶ 113}** Courts have divided over whether disparate treatment of accomplices is relevant mitigation. See *Downs v. Dugger* (Fla.1987), 514 So.2d 1069, 1072 (lesser sentence for accomplice is mitigating). See, also, *State v. White* (1999), 194 Ariz. 344, 352, 982 P.2d 819, 827 (unexplained discrepancy between defendant's and accomplices' sentences may be mitigating); *State v. Ferguson* (Del.Super.1992), 642 A.2d 1267, 1269, citing *Riley v. State* (Del.1985), 496 A.2d 997, 1026; *State v. McIlvoy* (Mo.1982), 629 S.W.2d 333, 341-342 (*en banc*). Contra *People v. Carrera* (1989), 49 Cal.3d 291, 343, 261 Cal.Rptr. 348, 381, 777 P.2d 121, 154 (punishment meted out to accomplices not relevant to whether defendant should be sentenced to death); *Brogdon v. Butler* (C.A.5, 1987), 824 F.2d 338, 343; *Coulter v. State* (Ala.Crim.App.1982), 438 So.2d 336, 344-346; *People v. Page* (1993), 156 Ill.2d 258, 271-272, 189 Ill.Dec. 371, 620 N.E.2d 339, 347-348.

**{¶ 114}** However, we need not address that issue today. Because of the agreement, the trial court ultimately permitted the jury to learn what sentences Jones and Callahan had received. Herring was thus able to ask the jury to weigh those sentences in his favor as mitigating factors. Similarly, Herring was permitted to argue that the state's agreements with Dalton and Allen militated against the death penalty for Herring.

**{¶ 115}** It is true that not all the proffered defense exhibits were admitted. However, the defense withdrew those exhibits pursuant to its agreement with the prosecutor. Herring presents no reason why he should be allowed to go back on his

bargain. Having agreed to withdraw them, he waived any issue as to their admissibility. Accordingly, Herring's twelfth proposition of law is overruled.

### B. Other sentencing issues

**{¶ 116}** In his sixteenth proposition of law, Herring contends that victim-impact statements by Aziz and Marinelli violated the Eighth Amendment.

**{¶ 117}** After the jury's sentencing recommendation, the trial judge held a sentencing hearing. Pursuant to R.C. 2930.14(A), Aziz and Marinelli made victim-impact statements pertaining to the sentences for the attempted aggravated murder counts. However, both victims stated that Herring should be sentenced to death. The trial court then sentenced Herring on all seven counts, including death sentences on Counts One through Three.

**{¶ 118}** In capital cases, the Eighth Amendment prohibits the admission or consideration of expressions of opinion in favor of a death sentence. See *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 438-439, 650 N.E.2d 878, 882. However, judges, unlike juries, are presumed to consider only relevant evidence. *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759; *Fautenberry*, 72 Ohio St.3d at 439, 650 N.E.2d at 882. The sentencing opinion does not indicate that the judge considered the victim-impact statements when sentencing Herring on the capital counts. See *id*.

**{¶ 119}** Herring seeks to overcome this presumption by pointing out that R.C. 2930.14(B) required the judge to consider the statements in sentencing on the noncapital counts. We presume that the judge did so here, but we have no reason to suppose that he also considered them on the capital counts. In *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, where the trial judge considered victim-impact statements in sentencing the defendant on both capital and noncapital offenses, we found "no affirmative indication that the victim impact statements were considered in sentencing [the defendant] to death." *Id.* at 33-34, 544 N.E.2d at 913. We find none here either.

{¶ 120} Herring further notes that the sentencing opinion discusses the attempted murders of Aziz and Marinelli. That was proper, since the attempted murders are part of the (A)(5) specification. But it hardly follows that he also considered the victim-impact statements when he sentenced on the capital counts. Herring's sixteenth proposition of law is overruled.

{¶ 121} In his eighteenth proposition of law, Herring contends that the trial court's sentencing opinion was erroneous in two respects.

{¶ 122} First, he notes that the opinion erroneously speaks of the "aggravating *circumstances*" even though he was convicted of only one aggravating circumstance with respect to each aggravated murder count. From this, Herring contends that the judge weighed the aggravating circumstances from all three counts collectively against the mitigating factors, contrary to *State v. Cooey*, *supra*, 46 Ohio St.3d at 38-39, 544 N.E.2d at 916-917, and paragraph three of the syllabus. We disagree. Other than the easily explained extra "s," there is no indication in the record that the trial judge improperly aggregated the aggravating circumstances. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 348-349, 703 N.E.2d 1251, 1265-1266.

{¶ 123} Second, Herring contends that the trial court failed to consider all the mitigating factors he presented. However, the sentencing opinion need not specifically mention all of the mitigating factors presented. *State v. Phillips*, *supra*, 74 Ohio St.3d at 102, 656 N.E.2d at 670.

{¶ 124} Herring's eighteenth proposition of law is overruled.

{¶ 125} In his twenty-first proposition of law, Herring contends that the Ohio death-penalty statutes are unconstitutional. We summarily overrule this proposition. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph one of the syllabus; *State v. Henderson* (1988), 39 Ohio St.3d 24, 26, 528 N.E.2d 1237, 1240; *State v. Phillips*,

74 Ohio St.3d at 103-104, 656 N.E.2d at 670-671. See, also, *Garza v. Lappin* (C.A.7, 2001), 253 F.3d 918, 925-926 (Organization of American States' American Convention on Human Rights is not binding on United States).

## IX. Instructions

{¶ 126} In his fifth, fourteenth, seventeenth, and nineteenth propositions of law, Herring contends that the trial court made various errors when instructing the jury. However, at trial he did not object to any of the instructions challenged here. He thereby waived these issues. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph one of the syllabus. We find no plain error with respect to any of these claims. Accordingly, we overrule Herring's fifth, fourteenth, seventeenth, and nineteenth propositions of law as waived.

## X. Independent Sentence Review

{¶ 127} Under R.C. 2929.05, we independently review the death sentence on each of the aggravated murder counts. We must determine whether the evidence supports the jury's finding of an aggravating circumstance, whether the aggravating circumstance outweighs the mitigating factors, and whether the death sentence is proportionate to death sentences affirmed in similar cases.

{¶ 128} The sole aggravating circumstance on each count is that the aggravated murder was part of a course of conduct involving the purposeful killing or attempted killing of two or more persons by Herring.

{¶ 129} The evidence shows that all five killings and attempted killings were part of a single course of conduct. Moreover, we find sufficient evidence that Herring intended the deaths of Jones, Naze, Kotheimer, Aziz, and Marinelli. The manner in which the robbery was committed strongly suggests that each of the robbers, including Herring, intended to kill all of the victims.

{¶ 130} The robbers clearly coordinated their actions in advance. They discussed the robbery among themselves before going into the Newport Inn; they divided into two groups to cover both doors; they started shooting almost

immediately. The coordination displayed here belies the notion that the killings were merely impulsive acts by individual members of the gang. That coordination supports the conclusion that the killings were integral to the robbery plan and that each of the robbers intended to kill the victims as part of that plan.

{¶ 131} And that inference is especially strong with regard to Herring, because he was the evident ringleader. It was at his house that the robbers assembled, and he initiated the discussion of the robbery. Herring was the only robber prepared with a mask. He also obtained the guns (except Foose's), and he decided who would carry which gun.

{¶ 132} There is sufficient evidence to support the jury's finding of the multiple-murder aggravating circumstance. "[I]ntent may be inferred from the circumstances surrounding the crime." *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus.

{¶ 133} Against this aggravating circumstance, we must weigh the mitigating factors present in the record.

{¶ 134} The youth of the offender is a statutory mitigating factor. R.C. 2929.04(B)(4). Herring, born on August 30, 1977, was eighteen years and eight months old on April 30, 1996, when he took part in these murders. The (B)(4) factor is an important one, since Herring is only eight months above the minimum age for death eligibility.

{¶ 135} Under R.C. 2929.04(B)(6), "[i]f the offender was a participant in the offense but not the principal offender," the court must consider "the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim." Herring was not proven to be the principal offender. Therefore, this mitigating factor applies.

{¶ 136} However, where the offender plays a "critical role" as a "leader," we have held that the (B)(6) factor will carry less weight. See *State v. Robb* (2000),

88 Ohio St.3d 59, 91, 723 N.E.2d 1019, 1051. Here, the evidence shows that Herring played such a role.

{¶ 137} A related factor is the noncapital sentences received by Herring's accomplices Callahan, Dalton, Allen, and Jones. The state vigorously contends that lesser sentences received by accomplices are not a proper mitigating factor in a capital case. Yet the state agreed at trial that the accomplices' sentences *could* be considered in mitigation. As we said earlier of the defense, we see no reason why the state should not be held to its bargain. We will therefore consider the accomplices' sentences.

{¶ 138} Antwan Jones was convicted of three counts of aggravated murder, without capital specifications, and was sentenced to life with parole eligibility after twenty years of imprisonment on each count. See R.C. 2929.03(A). He was also convicted of two counts of attempted aggravated murder and two counts of aggravated robbery, and received an indefinite term of ten to twenty-five years on each count. He was convicted of a firearm specification and received an additional three years' actual incarceration. All sentences were ordered to run consecutively. Adelbert Callahan was convicted of complicity in the same array of charges and received identical sentences.

{¶ 139} During the penalty phase, Assistant Prosecuting Attorney Timothy Franken testified that he had voluntarily dismissed the aggravating-circumstance specifications against Jones because he did not think he could prove them. As for Callahan, he was a juvenile at the time of the offense and therefore not eligible for the death penalty.

{¶ 140} Kitwan Dalton testified that he was charged with fleeing a police officer. See R.C. 2921.331(B) (operating motor vehicle so as to flee or elude police) and 2921.331(C)(4) (violation of R.C. 2921.331[B] is fourth-degree felony if offender was fleeing immediately after committing a felony). At the time of trial

he was awaiting sentencing and acknowledged that he faced imprisonment. Pursuant to Dalton's agreement to testify, all other charges were dropped.

{¶ 141} Louis Allen was charged with perjury and entered an admission of delinquency in juvenile court. He too was awaiting sentencing at the time of trial. He had an agreement with the state that "if I was truthful at the trial, then I would not get charged with anything but perjury."

{¶ 142} We give some weight to the lighter sentence given to Antwan Jones. While Franken testified that he could not prove death specifications against Jones, this explanation is not completely convincing. Jones's five convictions for aggravated murder and attempted aggravated murder all required proof of intent to kill, so the (A)(5) multiple-murder specification should also have been provable.

{¶ 143} On the other hand, since Herring was the leader, the state certainly had a stronger case against him than against Jones on the issue of intent. Moreover, the state had ballistics evidence pointing to Herring, not Jones, as the actual killer on Count One (even though the jury acquitted Herring of being the actual killer on that count). There was no such evidence against Jones, who was carrying a .357-caliber firearm rather than a 9 mm. The state thus had a rational basis to seek the death penalty for Herring and not for Jones.

{¶ 144} However, the lesser sentences given to Foose, Callahan, Allen, and Dalton deserve little (if any) weight in mitigation because of the differences between their situations and Herring's. Foose and Callahan were juveniles, exempt from the death penalty. Allen did not shoot anyone; indeed, he ran away as soon as the shooting started. Dalton neither entered the Newport Inn nor carried a weapon.

{¶ 145} Finally, we consider the testimony of Herring's mother, Deborah Herring, and his older sister, Nicole Herring. Herring's mother testified that he helped her with household chores as soon as "he could walk and pick up stuff." Herring had five younger siblings, with whom he had a "good and loving

relationship." As part of their daily chores, Herring and Nicole used to bathe, feed, and play with the younger children. Herring's siblings remained close to him and saw him when they could, even though he was in jail. Both Deborah and Nicole Herring asked the jury to spare Herring's life. Herring's loving relationship with his family is a mitigating factor, but we give it little weight.

{¶ 146} While mitigating factors exist in this case, the single aggravating circumstance—Herring's intentional participation in three murders and his personal attempt to commit two more—outweighs the mitigating factors beyond a reasonable doubt.

{¶ 147} We further find that the death sentence in this case is proportionate to death sentences affirmed in other multiple-murder cases. See, *e.g.*, *State v. Hessler* (2000), 90 Ohio St.3d 108, 734 N.E.2d 1237; *State v. Williams*, 79 Ohio St.3d 1, 679 N.E.2d 646; *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960; *State v. Kinley* (1995), 72 Ohio St.3d 491, 651 N.E.2d 419; *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294 (one victim, an additional intended victim).

{¶ 148} The convictions and death sentences are therefore affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, HILDEBRANDT and LUNDBERG STRATTON, JJ., concur.

LEE H. HILDEBRANDT, JR., J., of the First Appellate District, sitting for COOK, J.

————————

*Paul J. Gains*, Mahoning County Prosecuting Attorney, *Janice T. O'Halloran* and *Dawn M. Durkin*, Assistant Prosecuting Attorneys, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Pamela Prude-Smithers* and *Angela Greene*, Assistant State Public Defenders, for appellant.

————————