[Cite as *State v. Griffin*, 2013-Ohio-2230.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

STATE OF OHIO

      Plaintiff-Appellee

v.

DE'ARGO GRIFFIN

      Defendant-Appellant

Appellate Case No.    24001

Trial Court Case No.   2009-CR-1117/3

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of May, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

DARRELL L. HECKMAN, Atty. Reg. No. 0002389, One Monument Square, Suite 200, Urbana, Ohio 43078
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, De'Argo Griffin, appeals from his conviction and sentence, after a jury trial, on one count of possession of heroin in an amount between ten and fifty grams, in violation of R.C. 2925.11(A); five counts of possession of criminal tools in violation of R.C. 2923.24(A); and one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1). We originally affirmed Griffin's conviction in February 2012. See *State v. Griffin*, 2d Dist. Montgomery No. 24001, 2012-Ohio-503. In April 2012, Griffin filed a motion to reopen his appeal, based on a claim of ineffective assistance of appellate counsel. We granted the motion to reopen in May 2012, and appointed appellate counsel for Griffin, who is indigent.

{¶ 2} In his reopened appeal, Griffin contends that the trial court erred in failing to give Griffin's requested jury instruction on "enterprise." Griffin also maintains that the evidence is insufficient to establish that gel caps found in the vehicle in which he was a passenger were separate from the heroin also found in the vehicle. In addition, Griffin contends that the trial court erred in sentencing him for possession of criminal tools when the items in question (a razor, gel capsules, a plate, and a baggie) are drug paraphernalia. Griffin also contends that the court erred in sentencing him for possession of criminal tools when the items in question are cell phones. Finally, Griffin contends that the trial court erred in overruling his motion to suppress and in instructing the jury on complicity, over his objection, where the bill of particulars identified Griffin as the principal offender.

{¶ 3} We conclude that the trial court committed reversible error in failing to give Griffin's requested jury instruction on "enterprise." The trial court also erred in sentencing Griffin for possession of items that are properly classified as drug paraphernalia rather than criminal tools. The trial court did not err in classifying a cell phone as a criminal tool and in

sentencing Griffin accordingly. Further, the evidence was sufficient to establish that the gel capsules were separate items and were not part of the heroin also found in the vehicle. Finally, the trial court did not err in overruling Griffin's motion to suppress or in instructing the jury on complicity. Accordingly, Griffin's conviction for Engaging in a Pattern of Corrupt Activity will be reversed, the judgment, insofar as the sentence on four of five Possession of Criminal Tools is concerned, will be reversed, and the cause will be remanded for further proceedings. In all other respects, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 4}     Griffin and his co-defendant, Anthony Franklin, were tried together before a jury in March 2010, and were convicted as charged. A full recitation of the factual background of the case can be found in *Griffin*, 2d Dist. Montgomery No. 24001, 2012-Ohio-503, ¶ 1-4 (affirming Griffin's conviction), and *State v. Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, ¶ 1-33 (affirming Franklin's conviction in part, and reversing as to Franklin's conviction for Engaging in a Pattern of Corrupt Activity). Those factual findings are incorporated for purposes this opinion, and will not be detailed further, except where necessary for the resolution of issues pertinent to this opinion.

{¶ 5}     Franklin's appeal was decided in December 2011, and Griffin's was decided in February 2012. Griffin's appellate attorney did not raise the issue upon which Franklin's reversal of the conviction for Engaging in Pattern of Corrupt Activity was based. Accordingly, Griffin filed a motion to reopen his appeal, and we granted the motion, indicating that Griffin could raise this error as well as any other error deemed to have merit. We also appointed appellate counsel for Griffin, who filed a brief raising six additional assignments of error, including an assignment of error directed toward the failure to give a requested jury instruction on "enterprise."

## II.  Did the Trial Court Err in Failing to Give

## an Instruction on Enterprise?

{¶ 6}     Under this assignment of error, Griffin notes that he and co-defendant Franklin asked the trial court to give the jury a separate instruction on "enterprise" as an element of Engaging in a Pattern of Corrupt Activity, but the court refused.  Griffin contends that his conviction for this crime should be reversed, based on our opinion in *Franklin*, which extensively considered the issue and concluded that the trial court had committed reversible error in failing to give the same instruction on "enterprise."  Despite any disagreement of the majority of this panel with *Franklin*, it is direct precedent in this case and we will abide by it in accordance with *stare decisis*.

{¶ 7}     In *Franklin*, Griffin's co-defendant argued that "the trial court's instructions to the jury were prejudicial in three respects: (1) the court erroneously instructed the jury on the definition of the term 'participate in,' as used in R.C. 2923.32(A)(1); (2) the court erroneously denied Franklin's request to instruct the jury on precedent in this appellate district regarding the standard to be used to convict defendants of engaging in a pattern of corrupt activity; and (3) the court erred when it denied Franklin's request to instruct the jury on applicable federal law, as required in this appellate district."  *Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, at ¶ 69.

{¶ 8}     We rejected the first argument, but agreed with Franklin's latter two contentions, which we discussed together.  *See, id.* at ¶ 80-106.  After discussing pertinent case law in our district, other Ohio appellate districts, and the federal courts, we stated that:

> In light of the preceding discussion, we agree with Franklin that the trial
>
> court should have instructed the jury, consistent with the federal law on

"enterprise" outlined in *Turkette* and *Boyle*. We have never specifically rejected the application of federal law, and, in fact, have both impliedly and expressly applied federal law to Ohio RICO cases when deciding questions of sufficiency of the evidence.

As we noted, the Supreme Court of Ohio has said that "it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." *Scott*, 26 Ohio St.3d 92, 101. The definitions outlined in *Turkette* and *Boyle* are pertinent, and state the law correctly. They are also not covered by the general charge, which contained only the statutory definition of enterprise. Although there is evidence in the record that could support a finding of an enterprise, the jury was not properly instructed on the point. *Franklin* at ¶ 105-106, citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and *Boyle v. United States*, 556 U.S. 938,129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

{¶ 9}    After making these remarks, we reversed Franklin's conviction for Engaging in a Pattern of Corrupt Activity and remanded the case for further proceedings. *Franklin* at ¶ 107.

{¶ 10}    The State concedes in its brief that Griffin and Franklin were tried together, and that the same jury instruction was provided for both Griffin and Franklin. In arguing that the same result should not occur here, the State advances several points.

{¶ 11}    The State's first argument is that Griffin's counsel failed to file the proposed jury instructions on "enterprise" prior to trial, and that Griffin's counsel failed to subsequently request the instruction in writing, as required by Crim.R. 30(A).

{¶ 12}    As a preliminary matter, we note that neither the State nor the defense filed

proposed jury instructions prior to trial, and neither side filed requested instructions in writing. At the close of evidence, the court provided the parties with copies of proposed instructions for their review, and indicated that the instructions would be discussed the following morning, so that any amendments or corrections could be made.   Trial Transcript, Volume VI, p. 1289.

{¶ 13}    Crim.R. 30(A) provides for waiver regarding jury instructions, by stating that:

On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.

Opportunity shall be given to make the objection out of the hearing of the jury.

{¶ 14}    Griffin did object before the jury retired, and specifically stated the grounds of his objection.   The trial court and the attorneys also discussed the instructions extensively before closing arguments, and some changes were made.    *See* discussion at Trial Transcript, Volume VII, pp. 1303-1304 (referring to a two-hour discussion that had taken place earlier that day).

{¶ 15}    After closing arguments occurred, and before the case was submitted to the jury, the defense objected to various parts of the instructions, and requested an instruction on "enterprise" under *State v. Fritz*, 178 Ohio App.3d 65, 2008-Ohio-4389, 896 N.E.2d 778 (2d Dist.), and *Boyle,* 556 U.S. 938,129 S.Ct. 2237, 173 L.Ed.2d 1265.    *Id.* at pp. 1363-1369. Accordingly, Griffin did not waive the objection.    *See*, *e.g.*, *State v. Williford*, 49 Ohio St.3d 247, 247-248, 551 N.E.2d 1279 (1990), paragraph three of the syllabus (noting that "[w]here the trial court fails to give a complete or correct jury instruction on the elements of the offense charged and the defenses thereto which are raised by the evidence, the error is preserved for appeal when the defendant objects in accordance with the second paragraph of Crim.R. 30(A), whether or not there has been a proffer of written jury instructions in accordance with the first paragraph of Crim.R. 30(A).")   *Accord*, *State v. Mack,* 82 Ohio St.3d 198, 199-200, 694 N.E.2d 1328 (1998).

{¶ 16} The State's second argument is that there was no form or specificity to the defense request. Again, we disagree. We noted in *Franklin* that the defense "extensively argued the application of the law in *Boyle*, when jury instructions were being considered." *Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, at ¶ 83. The defense also specifically discussed the elements of "enterprise" that it wanted included in the instruction, and this was sufficiently detailed for the trial court to fashion an appropriate instruction. See Trial Transcript, Volume VII, p. 1366.

{¶ 17} The State's next argument is that the trial court did not abuse its discretion by failing to instruct the jury on enterprise. In this regard, the State first argues that the trial court could not have possibly exercised "perversity of will," or passion, or bias, because the court had to choose between including the requested instruction and committing error based on prior authority in this district, or refusing the instruction and committing error that was subsequently found reversible in *Franklin*.

{¶ 18} In *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989), the Supreme Court of Ohio held that decisions to refuse a particular instruction are reviewed by a standard of whether the refusal "was an abuse of discretion under the facts and circumstances of the case." *Id.* at 68. We have followed this rule. *See, e.g.*, *State v. Collier*, 2d Dist. Montgomery No. 20131, 2005-Ohio-119, ¶ 25.

{¶ 19} " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' " *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A review under the abuse-of-discretion standard is a deferential review. It is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same

conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Id.*

**{¶ 20}** However, as was noted in *Franklin*, *de novo* review applies to the issue of whether the jury instructions correctly state the law. *Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, at ¶ 82. The Supreme Court of Ohio has characterized appellate review of jury instructions in this situation as presenting "a question of mixed law and fact, where a mixed de novo and abuse-of-discretion standard of review would be appropriate." *Morris* at ¶ 21, citing *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995).

**{¶ 21}** An issue of fact would involve a determination of issues like whether the facts in a particular case warrant a particular instruction. For example, in *Wolons*, the issue was whether the evidence at trial warranted a jury instruction on intoxication. Applying an abuse of discretion standard, the Supreme Court of Ohio concluded that the trial court did not act arbitrarily or unconscionably in refusing the instruction, because the facts fell "short of negating a conscious awareness of the circumstances and events that transpired on the night of the stabbing." *Wolons*, 44 Ohio St.3d at 69, 541 N.E.2d 443.

**{¶ 22}** In contrast, *Kokitka* involved an instruction to the jury to give no weight to expert testimony if the jury found facts that were different from those assumed by the expert. *Kokitka* at 92. The Supreme Court of Ohio concluded that the instruction usurped the jury's role in evaluating the testimony, and the Supreme Court, therefore, gave no deference to the trial court's decision. *Id.*

**{¶ 23}** In the case before us, the issue is not factual, meaning that the argument is not whether an instruction on "enterprise" was factually warranted under the circumstances of the case. Instead, the issue is whether the instruction that was given correctly states the applicable law. The analysis, therefore, is not based on abuse of discretion, as the State suggests, and *de*

*novo* review, which we used in *Franklin*, is the appropriate method for evaluating the trial court's action.

{¶ 24} As a further matter, we noted in *Franklin* that "[w]e have never specifically rejected the application of federal law, and, in fact, have both impliedly and expressly applied federal law to Ohio RICO cases when deciding questions of sufficiency of the evidence." *Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, at ¶ 105. Notwithstanding this court's prior use of federal law to test the sufficiency of the evidence, the critical issue is whether the trial court's instruction following the statutory language was deficient in a way that prejudiced Griffin.

{¶ 25} The State contends that the failure to give the requested instruction did not prejudice Griffin. In this regard, the State argues that the instruction the trial court submitted to the jury adequately conveyed all the information needed to determine whether Griffin was associated with an enterprise under Ohio law. In its instruction the trial court defined "enterprise" and "pattern of corrupt activity" and instructed the jury that both needed to be proven beyond a reasonable doubt.

{¶ 26} Essentially, the State is asking us to reconsider our decision in *Franklin*. Although this author agrees with the State on this point, we must decline the invitation. The doctrine of *stare decisis* binds this panel of the court to adhere to *Franklin* "in order to foster predictability and continuity, prevent the arbitrary administration of justice, and provide clarity to the citizenry." (Citation omitted.) *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d 568. ¶ 19, n. 2. Adherence to *stare decisis* will avoid the inconsistent application of federal law in corrupt activity cases within and between some appellate districts which were fully articulated in *Franklin* at ¶ 89-95. This court has held in *Franklin* and other cases (e.g. *State v. Beverly*, 2d Dist. Clark No. 2011-CA-64, 2013-Ohio-1365) that the OJI instruction is not

sufficient on this issue, but acknowledged that it is not beyond legitimate debate. Given the conflicting opinions and interpretations in the districts, we urge The Supreme Court of Ohio to examine and clarify the law on what constitutes a proper instruction on the definition of enterprise.

{¶ 27}   As a final argument, the State contends that the facts of the case support no other conclusion but that Griffin, Franklin, and others were engaged in a pattern of corrupt activity. This court noted in *Franklin* that "[a]though there is evidence in the record that could support a finding of an enterprise, the jury was not properly instructed on the point." *Id.* at 106.  Again, although this author disagrees with the *Franklin* decision on this issue, we again defer to this court's prior decision under the doctrine of *stare decisis*.

{¶ 28}   Accordingly, Griffin's First Assignment of Error is sustained.  The conviction for Engaging in a Pattern of Corrupt Activity will be reversed, and this cause will be remanded for further proceedings.

### III.   Was the Evidence Insufficient Regarding Gel Caps?

{¶ 29}   Griffin's Second Assignment of Error is as follows:

The Evidence Was Insufficient as a Matter of Law to Establish the Gel Caps were Criminal Tools.

{¶ 30}   Under this assignment of error, Griffin contends that the gel caps were part of the heroin that was found, and cannot be considered a separate criminal tool.  Alternatively, Griffin contends that his conduct in possessing both the gel caps and the heroin contained in the gel caps were allied offenses of similar import.

{¶ 31}   The original indictment, filed on April 10, 2009, charged Griffin with possession of heroin in an amount equaling or exceeding ten grams, but less than fifty grams, in violation of

R.C. 2925.11(A). Re-indictment "B" was filed on October 26, 2009, charging Griffin in Count One of possessing capsules with purpose to use them criminally in the commission of a felony in violation of R.C. 2923.24(A); in Count Two, with possession of a razor with purpose to use it criminally in the commission of a felony in violation of R.C. 2923.24(A); in Count Three with possession of a plate with purpose to use it criminally in the commission of a felony in violation of R.C. 2923.24(A); in Count Four with possession of cell phone(s) with purpose to use it criminally in the commission of a felony in violation of R.C. 2923.24(A); in Count Five with possession of plastic baggie(s) with purpose to use it criminally in the commission of a felony in violation of R.C. 2923.24(A); and in Count Six with having been engaged in a pattern of corrupt activity between the dates of May 13, 2006 through April 2, 2009, with at least one incident of corrupt activity being possession of heroin in amount between 10 and 50 grams on April 1, 2009, in violation of R.C. 2923.32(A)(1).

{¶ 32} After the jury found Griffin guilty on all counts, the trial court sentenced him to five years of imprisonment for possession of heroin in an amount more than 10 grams but less than 50 grams; five years of imprisonment for engaging in a pattern of corrupt activity, and twelve months of imprisonment on each count of possession of criminal tools, all to be served concurrently for a total term of incarceration of five years. The sentence for the capsules, thus, was a twelve-month sentence, to be served concurrently with the other sentences.

{¶ 33} The State argues that Detective House found both heroin and empty gel caps in the white conversion van in which Griffin was seated, and that Griffin was properly charged separately with possession of the gel caps.

{¶ 34} Our prior opinion noted that on April 1, 2009, Griffin was arrested while sitting in the front passenger seat of a grey and white conversion van that was parked in the parking lot of a convenience store. *Franklin*, 2d Dist. Montgomery Nos. 24011 and 24012, 2011-Ohio-6802, at

¶ 28-29. The following evidence was recovered from the van: a bag of heroin containing about 27 grams of heroin in a pocket on the back of the seat where Griffin was sitting; and two baggies that were sitting in a cup holder behind the driver's seat. One of the baggies in the cup holder held 27 gel capsules of what appeared to be heroin, and the other contained a four-gram chunk of heroin. *Id.* at ¶ 30. In addition, a large bag of unused gel capsules was lying on the center console immediately to Griffin's left. *Id.* Finally, other bags containing unused gel capsules and baggies containing what appeared to be heroin residue were found in storage pouches behind Franklin's seat. *Id.* See, also, Trial Transcript, Volume VI, pp.1144-1151. Testimony at trial also indicated that the gel caps are used in the packaging and sale of heroin. *Id.* at p. 1161.

{¶ 35} The State correctly points out that the weight of the heroin found in the chunks of heroin and the gel caps containing heroin, exclusive of the empty gel caps, accounts for the 33.19 grams mentioned in the indictment for possession of heroin. See Trial Transcript, pp. 887-893. As a result, Griffin could be separately charged and convicted for possession of the empty gel caps as well for as the heroin and gel caps that contained heroin. These are not the same offenses.

{¶ 36} R.C. 2941.25(A) provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Supreme Court of Ohio stated that "[u]nder R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct." *Id.* at ¶ 47. The court went on to note that:

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one

without committing the other. *Blankenship*, 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses can be committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

\* \* \*

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge. *Johnson* at ¶ 48-51.

**{¶ 37}** R.C. 2923.24(A) provides that "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." In contrast, R.C. 2925.11(A) states that "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog."

**{¶ 38}** Under the circumstances of this case, the offenses were not committed with the same conduct. Griffin's position is based on the contention that his conviction for possession of criminal tools was based on the capsules that surrounded the heroin. However, this is incorrect. The conviction was based on the empty gel capsules, which are used in packaging and selling heroin. For reasons that will follow, we conclude that Griffin should have been sentenced for the gel capsules as drug paraphernalia rather than as criminal tools, but Griffin's argument that these items were subsumed within the possession of the possession of heroin charge is incorrect.

**{¶ 39}** Griffin's Second Assignment of Error is overruled.


IV. Did the Trial Court Err in Sentencing Griffin for Possession of Criminal Tools?

**{¶ 40}** Griffin's Third Assignment of Error is as follows:

The Trial Court Erred in Sentencing Defendant for Possession of Criminal Tools that Were Drug Paraphernalia.

**{¶ 41}** Griffin contends under this assignment of error that the gel capsules, razor, baggies, and plate are "drug paraphernalia" rather than criminal tools. Accordingly, Griffin maintains that he should have been sentenced under R.C. 2925.14 for a fourth degree misdemeanor, rather than R.C. 2923.24, which elevates the crime to a fifth degree felony if the article is intended for use in the commission of a felony. In support of his argument, Griffin relies on *State v. Susser*, 2d Dist. Montgomery No. 12745, 1992 WL 41834 (March 2, 1992), and *State v. Wagner*, 6th Dist. Sandusky No. S-93-40, 1994 WL 590537 (Oct. 28, 1994), which followed *Susser*.

**{¶ 42}** R.C. 2925.14 (C)(1) prohibits any person from knowingly using or possessing with purpose to use, drug paraphernalia. Under R.C. 2925.14(A) "drug paraphernalia" is defined as:

[A]ny equipment, product, or material of any kind that is used by the offender, intended by the offender for use, or designed for use, in propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body, a controlled substance in violation of this chapter.

{¶ 43} R.C. 2925.14(A)(1)-(13) also provides a non-exclusive list of various equipment, products or materials that could be classified as drug paraphernalia. This list includes items like kits for cultivating controlled substances, scales or balances for weighing or measuring controlled substances, testing equipment for identifying the strength of controlled substances, hypodermic syringes, separation gins for removing twigs and seeds from marijuana, and so forth. In addition, the list includes these items:

(9) A blender, bowl, container, spoon, or mixing device for compounding a controlled substance;

(10) A capsule, balloon, envelope, or container for packaging small quantities of a controlled substance; [and]

(11) A container or device for storing or concealing a controlled substance.

{¶ 44} In comparison, R.C. 2923.24(A), which prohibits individuals from possessing or using criminal tools, states that "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."

{¶ 45} R.C. 2925.14 and R.C. 2923.24 have consisted in essentially the same format since they were enacted in 1989 and 1974, respectively. *Susser* involved two appeals to our court that were decided in 1990 and 1992.

{¶ 46} In the first appeal, we noted that the defendant had been convicted of several charges, including possession of cocaine in violation of R.C. 2925.11(A), and possession of criminal tools in violation of R.C. 2923.24. *State v. Susser*, 2d Dist. Montgomery No. CA 11787, 1990 WL 197958, *1 (Dec. 5, 1990), *abrogated in part on other grounds, State v. Teamer*, 82 Ohio St.3d 490, 696 N.E.2d 1049 (1998) (*Susser I*). During a search of the defendant's house, officers recovered narcotics-type items in the defendant's bedroom, including "a pipe, a vial containing white residue, a brass type funnel, and a brown bottle containing white residue." *Id.* at

* 6. In a kitchen drawer, an officer also recovered "a cut drinking straw next to a glass bottle containing a white residue he believed to be cocaine residue. [The officer] explained that cocaine is often ingested by a cut straw. He also recovered an aluminum nail with the same white residue."

*Id.*

**{¶ 47}** We reversed the conviction for drug abuse, concluding that the minute trace amounts of cocaine discovered on the drug paraphernalia could not satisfy the requirement that the defendant had "knowingly" possessed the cocaine. *Id.* at *11.[1] However, we affirmed the conviction for possession of criminal tools under R.C. 2923.24. We noted that R.C. 2925.12 could not apply, because it pertained only to hypodermic needles or syringes as the relevant drug instrument included in the statute. *Id.* We also rejected the application of R.C. 2925.14, which covered other implements, because that statute was not enacted until November 2, 1989, which was after the defendant had been charged with possession of criminal tools. *Id.*

**{¶ 48}** After we reversed and remanded the case, Susser was sentenced to consecutive sentences of 18 months in prison for possession of criminal tools, and one year in prison for violating his probation in a prior case. *State v. Susser*, 2d Dist. Montgomery No. 12745, 1992 WL 41834 (March 2, 1992) (*Susser II*). In *Susser II*, the defendant contended that he should have been sentenced under the lesser penalty for a violation of R.C. 2925.14, rather than the more severe penalty in R.C. 2923.24. *Id.* at *3. We agreed, concluding that there could be "no doubt that the 'criminal tools' that Susser was found to have possessed were 'drug paraphernalia' as defined in R.C. 2925.14(A)." *Id.* at *3-4. We noted the provision in R.C. 1.51 that:

"If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the

---

[1]This particular conclusion was later rejected in *Teamer*, 82 Ohio St.3d 490, 491-492, 696 N.E.2d 1049, after another district had

provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." *Id.* at *4.

**{¶ 49}** Based on this statute, we concluded that:

It is clear that "drug paraphernalia" is a subcategory of "criminal tool" and that R.C. 2925.14(C)(1) specially proscribes the possession of drug paraphernalia whereas R.C. 2925.24(A) generally proscribes the possession of any criminal tool.

*Id.*

**{¶ 50}** Because R.C. 2925.14 was in effect when Susser was sentenced in 1991, we held that he was entitled to the benefit of the penalty provisions in R.C. 2925.14. *Id.* Our opinion also cited a decision of the Supreme Court of Ohio – *State v. Volpe*, 38 Ohio St.3d 191, 527 N.E.2d 818 (1988) – as well as *State v. Chandler*, 54 Ohio App.3d 92, 560 N.E.2d 832 (8th Dist.1989).

**{¶ 51}** In *Volpe*, the defendants were charged with gambling, operating a gambling house, and possession of criminal tools. The criminal tools charge, brought under R.C. 2923.24, was based on two gambling machines that were found at a game room operated by the defendants. *Volpe* at 191-192. After being convicted of the charges, the defendants appealed, challenging "R.C. 2923.24 on the grounds that in enacting R.C. 2915.02, the General Assembly clearly stated a specific intent to charge with a misdemeanor, not a felony, first-time gambling offenders who engage or use a tool in gambling." *Id.* at 193.

**{¶ 52}** After examining R.C. 1.51, R.C. 2915.02, and R.C. 2923.24, the Supreme Court of Ohio held that:

---

certified a conflict with *Susser I.*

R.C. 2915.02(A)(5) and 2923.24 are irreconcilable. R.C. 2915.02(A)(5), in conjunction with R.C. 2915.02(F), treats possession of a gambling device as a first degree misdemeanor. As such, a person convicted of violating R.C. 2915.02(A)(5) could receive no prison sentence or a prison sentence of up to six months. See R.C. 2929.21. R.C. 2923.24 makes possession of criminal tools, arguably such instruments as gambling devices, a fourth degree felony, carrying a minimum prison sentence of six months and a maximum prison sentence of five years. See R.C. 2929.11. Therefore, since R.C. 2915.02 and 2923.24 provide for different penalties for the same conduct, they cannot be construed to give effect to both. R.C. 2915.02 and 2923.24 were enacted effective January 1, 1974, as part of the modern Ohio Criminal Code. Therefore, under R.C. 1.51, the general law, R.C. 2923.24, does not prevail as being the "later adoption." Further, the fact that the General Assembly enacted R.C. 2915.02(A)(5) to reach possession and control of gambling devices indicates that it did not intend for R.C. 2923.24 to reach possession and control of such devices. (Footnotes omitted.) *Volpe* at 193-194.

{¶ 53}   Subsequently, in *Chandler*, the Eighth District Court of Appeals applied the reasoning in *Volpe*, and concluded that "alleged possession of syringes could not be punished as anything other than a misdemeanor under R.C. 2925.12 and could not constitute possession of criminal tools under R.C. 2923.24." *Chandler,* 54 Ohio App.3d at 93-94, 560 N.E.2d 832.

{¶ 54}   Our decision in *Susser II* was subsequently followed by the Sixth District Court of Appeals in *Wagner*, 6th Dist. Sandusky No. S-93-40, 1994 WL 590537 (Oct. 28, 1994), at *3. In *Wagner*, the Sixth District Court of Appeals concluded that the defendant could only have been found guilty of violating R.C. 2925.14, not R.C. 2923.24, when the property seized was a tool

chest and two freezers in which marijuana had been stored, and scales used to weigh marijuana. *Id.* *Accord*, *State v. Kobi*, 122 Ohio App.3d 160, 181-182, 701 N.E.2d 420 (6th Dist.1997) (holding that possession of "(1) a radio frequency interference detector, (2) digital scales, (3) Harley Davidson coffee mug, (4) one clear glass jar and one black and white vase with a lid, and (5) numerous books amounting to instruction manuals on successful drug trafficking" could only be used to convict the defendant of possession of drug paraphernalia under R.C. 2925.14, not possession of criminal tools under R.C. 2923.24).

{¶ 55} As was noted, R.C. 2923.24 was enacted in 1974, and R.C. 2925.14 was enacted later, in 1989. Although R.C. 2925.14 has been amended a number of times, it has remained in essentially the same form since its enactment.

{¶ 56} In a recent decision, we concluded that a jury could properly conclude that a small plastic baggie in which cocaine was found could be a criminal tool. *State v. Moulder*, 2d Dist. Greene No. 08-CA-108, 2009-Ohio-5871, ¶ 8 (affirming convictions for possession of cocaine and possession of criminal tools, and reversing conviction for tampering with evidence.) The case that we cited for this proposition is *State v. Wilson*, 77 Ohio App.3d 718, 603 N.E.2d 305 (8th Dist.1991). *Id.*

{¶ 57} Subsequently, we relied on *Moulder* to find that a plastic baggie used to transport cocaine is a "criminal tool." *State v. Smith*, 2d Dist. Greene No. 2010-CA-36, 2011-Ohio-2568, ¶ 22 (finding evidence legally sufficient to sustain conviction for possession of criminal tools).

{¶ 58} In *Wilson*, the defendant was convicted of possessing criminal tools in violation of R.C. 2923.24 and drug abuse in violation of R.C. 2925.11. *Wilson* at 719. The facts in the opinion are sparse, but the criminal tools charge apparently arose from the defendant's possession of plastic baggies. *Id.* at 722. The opinion does not say what types of drugs may have been involved. The defendant argued on appeal that he should have been convicted under R.C.

2925.12, for possession of drug abuse instruments, rather than under R.C. 2923.24, for possession of criminal tools. In responding to this argument, the Eighth District Court of Appeals stated as follows:

> This court finds plastic baggies held by the appellant in the case *sub judice* meet the definition set forth in R.C. 2923.24 for possession of criminal tools. Plastic baggies do not fall within the parameters of R.C. 2925.12 because they are used in the drug industry for containing and packaging the drugs, and not primarily as an aid for administering or ingesting the drugs. *Wilson* at 722.

{¶ 59} The court's comment in *Wilson* was accurate, so far as it went, because R.C. 2925.12 deals solely with hypodermics or syringes used by an offender to unlawfully administer a dangerous drug other than marijuana. A plastic baggie clearly would not fit within this statute, since it is not a hypodermic or syringe.

{¶ 60} Nonetheless, in *Wilson*, the court failed to consider the appropriate statutory provision, R.C. 2925.14, which does deal with items used to contain and package drugs. If the court had considered that point, it would have gone on to decide, as we did in *Susser II*, whether a defendant is properly charged with having violated R.C. 2925.14 or R.C. 2923.24 when he or she is in possession of items that fall within the meaning of drug paraphernalia in R.C. 2925.14. *Susser II*, 2d Dist. Montgomery No. 12745, 1992 WL 41834, *3-4 (March 2, 1992).

{¶ 61} Accordingly, reliance on *Wilson* would be misplaced. *Susser II* is the appropriate authority on drug paraphernalia in this district. On the other hand, *Susser II* did not consider the effect of the Supreme Court of Ohio's decision in *State v. Chippendale*, 52 Ohio St.3d 118, 556 N.E.2d 1134 (1990). *Chippendale* established a framework for deciding whether R.C. 1.51 applies. According to the Supreme Court of Ohio, a court must first determine if the statutes are "general, special, or local. If the statutes are general and do not involve the same or

similar offenses, then R.C. 1.51 is inapplicable." *Id.* at 120.

{¶ 62}     In the case before us, R.C. 2923.24 is general, and R.C. 2925.14 is specific, and the statutes involve similar offenses. The analysis, therefore, proceeds to the next step, which *Chippendale* describes as follows: "if one of the statutes is general and one specific and they involve the same or similar offenses, we must then ask whether the offenses constitute allied offenses of similar import." *Id.*

{¶ 63}     The subject of how to approach allied offenses has been debated for many years. In *Johnson*, 128 Ohio St.3d 153,   2010-Ohio-6314, 942 N.E.2d 1061, the Supreme Court of Ohio gave the following explanation of its most recent permutation of the allied offense analysis:

> In determining whether two offenses should be merged, the intent of the General Assembly is controlling. We determine the General Assembly's intent by applying R.C. 2941.25, which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct. We have long held that the statute's purpose is to prevent shotgun convictions, as explained in the statute's Legislative Service Commission comments. *Geiger*, 45 Ohio St.2d at 242, 74 O.O.2d 380, 344 N.E.2d 133. With these considerations in mind, we adopt the following approach to determination of allied offenses.

> Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one

without committing the other. *Blankenship*, 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses can be committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged. *Johnson at* ¶ 46-50.

{¶ 64}    In the case before us, it is possible to commit both offenses (possession of criminal tools and possession of drug paraphernalia) with the same conduct. R.C. 2923.24 is a very broad statute, and covers the possession of "any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2925.14 is more specific, but it also covers possession, with intent to use drug paraphernalia. As we pointed out in *Susser II*, this is a "subcategory" of "criminal tool." *Susser II*, 2d Dist. Montgomery No. 12745, 1992 WL 41834, *4 (March 2, 1992). The offenses in this case were also committed by the same conduct, being a single act, and were committed with a single state of mind. All that occurred here, to form the offense, was simple possession of a forbidden object.

{¶ 65}    Under *Chippendale*, after the offenses have been determined to be of similar

import, they must also not have been crimes committed separately or with a separate animus in order for R.C. 1.51 to apply. *Chippendale*, 52 Ohio St.3d 118, 556 N.E.2d 1134, at 120-121. Again, the razor, gel capsules, plate, and baggies involved only simple possession of the forbidden items, and there is no indication that a separate animus was involved. Thus, R.C. 1.51 would apply.

{¶ 66}    Regarding the application of R.C. 1.51, the Supreme Court of Ohio noted in *Chippendale* that:

Where it is clear that a general provision of the Criminal Code applies coextensively with a special provision, R.C. 1.51 allows a prosecutor to charge on both. Conversely, where it is clear that a special provision prevails over a general provision or the Criminal Code is silent or ambiguous on the matter, under R.C. 1.51, a prosecutor may charge only on the special provision. The only exception in the statute is where " * * * the general provision is the later provision and the manifest intent is that the general provision prevail." Thus, unless the legislature enacts or amends the general provision later in time and manifests its intent to have the general provision apply coextensively with the special provision, the special provision must be the only provision applied to the defendant. *Chippendale* at 121.

{¶ 67}    R.C. 2923.24 was enacted in 1974, and R.C. 2925.14 is the later statute, having been enacted in 1989. R.C. 2923.24 has been amended only once, in 1995, and the amendments do not indicate that the statute is to be applied co-extensively with any other statute. R.C. 2925.14 has been amended a number of times, but has remained in essentially the same form since it was originally enacted. R.C. 2925.14 provides the more specific provision, and resort to that statute must be made in situations involving items that could be classified as drug paraphernalia

under R.C. 2925.14. Thus, *Susser II* retains validity, even though it did not use the analysis mandated by *Chippendale*.

{¶ 68} As was noted, R.C. 2925.14(C)(1) prohibits any person from knowingly using or possessing with purpose to use, drug paraphernalia. As pertinent to this case, R.C. 2925.14(A) defines "drug paraphernalia" as "any equipment, product, or material of any kind that is used by the offender, * * * in * * * preparing, * * * packaging, repackaging, storing, containing, [or] concealing, * * * a controlled substance in violation of this chapter." The non-exhaustive list of equipment and products that could be classified as drug paraphernalia includes items like bowls, spoons, and other implements used for compounding controlled substances; items like capsules, balloons, envelopes, or containers for packaging small quantities of a controlled substance; and containers or devices for storing or concealing controlled substances. R.C. 2925.14(A)(9)-(11).

{¶ 69} Under these definitions, the items in question were drug paraphernalia – the razor and plate (which contained drug residue) were used to prepare and cut the drugs, and the gel capsules and baggies were used for packaging and storing the drugs. See Trial Transcript, Volume VI, pp. 1155-1159, and pp. 1160-1161. Accordingly, Griffin should have been sentenced for a violation of R.C. 2925.14(C)(1) rather than for possession of criminal tools.

{¶ 70} Based on the preceding discussion, the Third Assignment of Error is sustained.

### V. Were the Cell Phones Drug Paraphernalia?

{¶ 71} Griffin's Fourth Assignment of Error states that:

The Trial Court Erred in Sentencing Defendant Appellant for Possession of Criminal Tools for Possessing Cellular Telephones.

{¶ 72} Under this assignment of error, Griffin contends that the cell phones found in the area of the drugs should also be considered drug paraphernalia rather than criminal tools. We disagree. The cell phones do not fit within the definition of "drug paraphernalia" in R.C.

2925.14(A). Although the cell phones were used to facilitate drug sales, they were not used to prepare, conceal, store, or repackage controlled substances, and the connection is too attenuated for the cell phones to be considered drug paraphernalia. Instead, the cell phones fit within R.C. 2923.24(A), as devices or instruments that an individual intends to use criminally.

{¶ 73} Accordingly, the Fourth Assignment of Error is overruled.

VI. Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 74} Griffin's Fifth Assignment of Error is as follows:

The Trial Court Erred in Overruling Defendant Appellant's Motion to Suppress.

{¶ 75} Under this assignment of error, Griffin contends that the trial court erred in overruling his motion to suppress evidence. According to Griffin, the flight of one individual (Franklin) from the van did not justify the detention and search of the other persons in the vehicle. In response, the State maintains that police officers had reasonable suspicion to stop and make contact with the occupants of the van. In addition, the State argues that a search of the van was justified under the automobile exception to the warrant requirement.

{¶ 76} The standards for reviewing decisions on motions to suppress indicate that the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1972). Accordingly, when an appellate court reviews suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard."

*Id.*

**{¶ 77}** Griffin filed several motions to suppress evidence. One motion asked the court to suppress evidence obtained from an illegal search and seizure on April 1, 2009. Docket # 14. The other motions involved suppression of statements that Griffin made to police on various occasions and are not being challenged on appeal.

**{¶ 78}** The trial court held a suppression hearing in June 2009 and received testimony from Dayton Police Detective David House, Dayton Police Sergeant Eric Steckel, and Dayton Police Officer Kevin Phillips.

**{¶ 79}** Detective House testified that on March 31, 2009, he was working as a narcotics detective and was using a cell phone number that he had gotten from another officer for individuals who were selling heroin in Dayton. After calling the number, House arranged to purchase heroin. Upon arriving at the location where he had been directed, House noticed a grey and white Chevrolet conversion van parked along the curb. The lights on the van were off, and the driver of the van quickly flashed his headlights at House, signaling that the van contained the individuals to whom House had been speaking. House pulled up next to the driver's side, and the driver told him to pull forward and turn around. The van had a temporary tag. As soon as House started to pull off and turn around, the van took off at a high rate of speed.

**{¶ 80}** House called the cell phone again and was told to go to a McDonald's restaurant on Free Pike. When House called the number again, the subjects informed House that they had recognized him and actually called him Detective House. House was not able to apprehend the individuals that evening.

**{¶ 81}** The next day, House spotted a grey and white Chevrolet conversion van that appeared to be the same van. He again tried to obtain the license plate number, but only saw a temporary tag. After the van passed House, it turned into the east end of the parking lot of the

AM/PM market on Salem Avenue, and backed into a parking spot. This was a high drug crime area and House had made numerous arrests in the general area for drugs. He had also done buy/bust operations in the parking lot of the market, when individuals would meet at that location to sell drugs.

{¶ 82} House lost sight of the van for a moment and then began to watch it. It appeared that the occupants of the van had gotten out and had gone into the convenience store. House then saw two individuals (later identified as DeShawn Foster and De'Argo Griffin) come out of the market, walk to the back door of the passenger side, and get into the vehicle.

{¶ 83} By this time, House had contacted uniformed officers to ask if they could assist. The uniformed officers arrived in a marked cruiser and turned into the AM/PM parking lot. The lights were not activated and the officers had not made contact with the van. As the cruiser was getting close to the van, the back door on the passenger's side was flung open, and Franklin jumped out of the van. Franklin then fled on foot. At that time, House could see that there were at least two other individuals in the van.

{¶ 84} House and two other officers ran after Franklin. House eventually apprehended Franklin on the street to the south that bordered the parking lot. After placing Franklin in handcuffs and patting him down, House removed about $3,500 from one of Franklin's pockets.

{¶ 85} Officer Eric Steckel remained at the van and made contact with the occupants. Steckel exited his cruiser and drew his weapon for his safety, because he was not sure what was going on. He was also the only one there, since his partner was involved in a foot chase. Steckel told the two occupants in the van to raise their hands. One occupant (later identified as Griffin) was in the front passenger seat of the van, and the other (later identified as Foster) was seated in the rear bench seat of the van.

{¶ 86} The van door from which Franklin had fled was still open, but Steckel was not

able to see into the van through that door. As he walked to the front of the van, he could see inside the van. The van contained two captain seats in the front for the driver and passenger, two more captain seats in the middle, and a third row of seating that had a bench seat.

{¶ 87} Steckel asked Griffin to step from the vehicle because he was by himself and wanted to place Griffin in the rear of his cruiser for his safety. When Griffin exited the van, Steckel could see a plastic bag containing several gelatin caps on the front console between the driver's and passenger's seats. He patted Griffin down and placed him in the rear of the cruiser. Griffin had $264 in his pocket. When Steckel felt the wad of money in Griffin's pocket and saw that Griffin had gelatin caps, he concluded that a drug crime was in progress.

{¶ 88} Steckel then returned to the van and ordered Foster out. As Foster was exiting from the rear of the van, Steckel looked down at the rear pocket of the passenger side seat. He could see in plain view a baggie containing what looked like a chunk of heroin.

{¶ 89} By then, Officer Saunders had returned from the foot chase and helped Steckel pat Foster down for officer safety and weapons. Saunders found $262 in Foster's pant pockets and a cell phone. According to Steckel, the two men were not being placed under arrest at that point. They were being detained for Detective House's investigation.

{¶ 90} After Saunders took control of Foster, Steckel went inside the van where he saw another plastic baggie in the cup holder on the driver's side of the van, behind the driver's seat. Steckel was conducting a search for drugs at that point. When officers find drugs in a vehicle, they are eventually going to tow the vehicle pursuant to Dayton Police policy.

{¶ 91} When House returned to the van, Officer Steckel pointed out several items in the van. Standing at the open passenger side door from which Franklin had jumped, House could see a baggie containing about one ounce of heroin in the pocket behind the front passenger seat, directly in front of where Franklin had been sitting. House stated that he could see the plastic

baggie without opening the pocket. The bag was clear and House could see large chunks of a brown substance, which in his experience appeared to be heroin.

{¶ 92} House could also see a baggie in a molded cup holder that contained gel caps of heroin. Gel capsules are the most common packing material that is used for heroin.

{¶ 93} House stated that all three individuals were then placed under arrest. Felony drugs were obviously inside the van, and it was going to be towed due to the arrest. The officers did an inventory search of the van prior to the tow.

{¶ 94} After hearing the evidence, the trial court overruled the motion to suppress evidence. The trial court concluded that all the factors, including the attempted drug transaction the night before and the similarity of the van, provided suspicion for the stop. The court further held that Officer Steckel was entitled to draw his gun for officer safety, and that when Griffin opened the door to leave the van, the drugs in plain sight on the console permitted the arrest and searches of the defendants. Transcript of Proceedings for May 7, 2009, June 19, 2009, July 9, 2009, and March 2, 2010, p. 125.

{¶ 95} In *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, we noted that:

> The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Martin*, Montgomery App. No. 20270, 2004-Ohio-2738, at ¶ 10, citing *Terry, supra*; *State v. Molette*, Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. A police officer may lawfully stop a vehicle, motorized

or otherwise, if he has a reasonable articulable suspicion that the operator has engaged in criminal activity, including a minor traffic violation. See *State v. Buckner*, Montgomery App. No. 21892, 2007-Ohio-4329, ¶ 8. *Roberts* at ¶ 14.

{¶ 96} "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." (Citation omitted.) *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph one of the syllabus. In the case before us, the totality of the circumstances indicate that the decision to conduct an investigative stop was proper. We agree with the trial court that Detective House had a reasonable articulable suspicion that criminal activity was afoot when the officers attempted to briefly detain the occupants of the van to investigate. Detective House had been involved in an attempted drug transaction with a very similar van the evening before, and thought the van was the same one. The area was also a high drug crime area, and House had previously made arrests in the parking lot where the van stopped. However, before the officers had a chance to stop and question the occupants of the van, Franklin ran from the van, further heightening the officers' suspicion that criminal activity was involved.

{¶ 97} The police also did not violate Griffin's rights by ordering him out of the van. "[A] police officer may order a motorist to get out of a car, which has been properly stopped for a traffic violation, even without suspicion of criminal activity." *State v. Evans*, 67 Ohio St.3d 405, 407, 618 N.E.2d 162 (1993), citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Although no traffic violation was involved in the case before us, the investigatory stop was lawful, and the officer acted reasonably in ordering Griffin to exit the vehicle. In *Evans*, the Supreme Court of Ohio stressed that:

> [T]he order to step out of the vehicle is not a stop separate and distinct from the original traffic stop. It is so minimal and insignificant an intrusion that the *Mimms* court refused to apply the requirements for an investigatory stop. Unlike an

investigatory stop, where the police officer involved "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906, a *Mimms* order does not have to be justified by any constitutional quantum of suspicion. *Evans* at 408.

{¶ 98}    Officer Steckel was also justified in drawing his weapon. " Use of a firearm during an investigatory stop may be permissible if the force is reasonable." *Columbus v. Dials*, 10th Dist. Franklin No. 04AP-1099, 2005-Ohio- 6305, ¶ 24, citing *Wells v. Akron*, 42 Ohio App.3d 148, 150, 537 N.E.2d 229 (9th Dist.1987), and *State v. Gaston*, 110 Ohio App.3d 835, 842, 675 N.E.2d 526 (11th Dist.1996). "In determining whether the use of force was reasonable, it is necessary for us to consider the totality of the circumstance surrounding the drawing of the weapon." *Id.* "The question is whether, under the circumstances, the officer's use of force was reasonably necessary to ensure his safety and whether the use of force was limited in scope and duration." (Citations omitted.) *State v. Dunson*, 2d Dist. Montgomery No. 20961, 2006-Ohio-775, ¶ 17.

{¶ 99}    Officer Steckel briefly drew his weapon for his safety because he was alone at the scene with at least two individuals in a car who were suspected of drug activity. Steckel was also not sure what was going on. Under the circumstances, it was reasonable for Steckel to arm himself briefly while he ascertained who was in the car and also assured himself that the individuals were not armed and a threat to his safety.

{¶ 100}       Once Griffin opened the door to the van, Steckel observed evidence of drug activity in plain view. House also saw various drugs and drug-related items in plain view when he returned to the van, by looking through the door that Franklin left open when he fled.

{¶ 101}       The plain view doctrine "authorizes the seizure, without the necessity of a

search warrant, of an illegal object or contraband that is immediately recognizable as such when it is in plain view of a law enforcement official." *State v. Moore*, 2d Dist. Montgomery No. 20198, 2004-Ohio-3783, ¶ 17, citing *Coolidge v. New Hampshire,* 403 U.S. 443, 465-466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *State v. Davie,* 86 Ohio App.3d 460, 464, 621 N.E.2d 548 (8th Dist. 1993). " 'Under [the plain view] doctrine, an officer may seize an item without a warrant if the initial intrusion leading to the item's discovery was lawful and it was "immediately apparent" that the item was incriminating.' " *Moore* at ¶ 17, quoting *State v. Waddy*, 63 Ohio St.3d 424, 442, 588 N.E.2d 819 (1992).

{¶ 102}     Finally, the search of the automobile was justified by the automobile exception to the Fourth Amendment's warrant requirement, which allows police to "conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband, and exigent circumstances necessitate a search or seizure." *State v. Moore*, 2d Dist. Montgomery No. 24934, 2012-Ohio-4315, ¶ 13, citing *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992) and *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In *Moore*, we noted that:

> A vehicle's mobility is the traditional exigency for this exception to the warrant requirement. *Mills* at 367; *California v. Carney*, 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment * * * permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). The automobile exception does not have "separate exigency requirement" beyond the vehicle's mobility. *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.E.2d 442 (1999). Moreover, "[t]he immobilization of the vehicle or low probability of its being moved or

evidence being destroyed does not remove the officers' justification to conduct a search pursuant to the automobile exception." *State v. Russell*, 2d Dist. Montgomery No. 19901, 2004–Ohio–1700, ¶ 34. *Moore* at ¶ 13.

{¶ 103} In light of the preceding discussion, the trial court did not err in overruling Griffin's motion to suppress evidence. The Fifth Assignment of Error is overruled.

VII. Did the Trial Court Err in Instructing on Complicity?

{¶ 104} Griffin's Sixth Assignment of Error is as follows:

The Trial Court Erred in Instructing the Jury on Complicity over Objection Where the Bill of Particulars Identified the Defendant as the Principal Offender.

{¶ 105} Under this assignment of error, Griffin objects to the fact that the trial court gave a complicity instruction when Griffin was led to believe that he was a principal offender in the bill of particulars that the State filed regarding each of Griffin's indictments. Griffin concedes that accomplices are punished the same as principal offenders, but argues that he should have been entitled to rely on the bill of particulars.

{¶ 106} In response to this argument, the State notes, citing Volume VII, pp. 1406-1410 of the Trial Transcript, that the trial court, in fact, identified Griffin as the principal offender when it instructed the jury.

{¶ 107} We have reviewed the citation to the Trial Transcript, and find nothing regarding complicity at the place Griffin cites in his brief (Trial Transcript, Volume VII, p. 1387.) At that point in the jury instructions, and for several pages before and after, the court was discussing the charges and verdict forms pertaining to Griffin's co-defendant, Anthony Franklin. *Id.* at pp. 1383-1406.

{¶ 108} During the discussion of jury instructions, there were objections to the

inclusion of language on aiding and abetting, because both Griffin and Franklin had been charged as principals. Trial Transcript, Volume VII, pp. 1377-1378. The State's response at that point was that the aiding and abetting statute placed the defendants on notice. *Id.* at p. 1377. The trial court noted the objection, and did charge the jury with regard to aiding and abetting in connection with Griffin's alleged offenses. *Id.* at pp. 1414-1418.

{¶ 109} The indictments charge Griffin as a principal offender, and the State's response to Griffin's request for a bill of particulars does not mention aiding and abetting. See Doc. #22 and Doc. #44.

{¶ 110} The Supreme Court of Ohio addressed a similar argument in *State v. Herring,* 94 Ohio St.3d 246, 762 N.E.2d 940 (2002). In *Herring*, the indictment charged the defendant with having been a principal offender in the aggravated murder of the victim, but the trial court instructed the jury that it could convict the defendant of aggravated murder either as the principal offender or as an aider and abettor. After the jury found the defendant guilty as an aider and abettor, the defendant appealed, contending that the instruction violated his Sixth Amendment right " 'to be informed of the nature and cause of the accusation.' " *Id.* at 251. Specifically, the defendant argued that "because the bill of particulars indicated that he was the principal offender on Count One, he lacked notice that the trial court would instruct on accomplice liability as to that count." *Id.*

{¶ 111} The Supreme Court of Ohio rejected the defendant's argument, noting that:

R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is "stated * * * in terms of the principal

offense" and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407–408. *Herring* at 251.

{¶ 112}  The Supreme Court of Ohio also found no prejudice to the defendant because the defendant failed to "indicate how he could have defended himself differently, given notice that complicity would also be an issue * * *." *Id.* at 251-252. The same comment applies here, since Griffin has not suggested how he would have defended himself differently if he had known that the jury would be instructed on complicity.

{¶ 113}  Based on the preceding discussion, the Sixth Assignment of Error is overruled.

## VIII.  Conclusion

{¶ 114}  Griffin's First and Third Assignments of Error having been sustained, and the Second, Fourth, Fifth and Sixth assignments of error having been overruled, Griffin's conviction for Engaging in a Pattern of Corrupt Activity is Reversed, and the judgment, insofar as it sentences Griffin to 12 months in prison on four of the five counts of Possession of Criminal Tools, is reversed and remanded for further proceedings. In all other respects, the judgment is Affirmed.

. . . . . . . . . . . .

FROELICH, J., concurs in judgment only.

HALL, J., concurring:

{¶ 115}  De'Argo Griffin is a co-defendant of Anthony Franklin, and they were

tried together. This court reversed Franklin's conviction for Engaging in a Pattern of Corrupt Activity, holding that a jury instruction on the term "enterprise," fashioned from federal case law on the subject, should have been given. *State v. Franklin*, 2d Dist. Montgomery Nos. 24011, 24012, 2011-Ohio-6802.

{¶ 116} I too am of the opinion that the jury instruction giving Ohio's statutory definition of "enterprise" was adequate, and I would not have required a jury instruction on the expanded federal definition if I were deciding the case in the first instance. Nevertheless, *State v. Franklin* is part of the jurisprudence of this court. The principle of stare decisis commands that a court should not lightly overrule its precedential authority. Moreover, internal consistency between co-defendants tried together further requires that we adhere to the *Franklin* decision. Accordingly, I concur with the lead opinion.

. . . . . . . . . . . .


Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Darrell L. Heckman
Hon. Steven K. Dankof