[Cite as *State v. Salmons*, 2014-Ohio-3804.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO                    C.A. No.        27108

    Appellee

    v.                                      APPEAL FROM JUDGMENT
                                        ENTERED IN THE
TRENT A. SALMONS                         COURT OF COMMON PLEAS
                                        COUNTY OF SUMMIT, OHIO
    Appellant                            CASE No.      CR 13 03 0798

DECISION AND JOURNAL ENTRY

Dated: September 3, 2014

---

BELFANCE, Presiding Judge.

{¶1}    Defendant-Appellant Trent Salmons appeals from his conviction in the Summit County Court of Common Pleas.  For the reasons set forth below, we affirm.

I.

{¶2}    On March 19, 2013, Joseph Mullet was at the Canton Road Drug Mart in Akron purchasing pseudoephedrine.  Because pseudoephedrine pills are commonly used to manufacture methamphetamine, their purchase is regulated.  At this time, at this Drug Mart, customers had to swipe their driver's licenses or, if that was not successful, sign a log book, in order to purchase pseudoephedrine pills.  Upon noticing that someone named Joseph Mullet was trying to purchase pseudoephedrine pills, the manager at the Drug Mart called police because she was aware that a Joseph Mullet was on a watch-list, provided to her by the police.  The watch-list contained the names of people that were suspected to be using pseudoephedrine pills for illegal purposes.

{¶3}   Upon arriving at the scene, police observed a man matching Mr. Mullet's description get into a vehicle with two other individuals, Mr. Salmons and John Syroid. Ultimately, all three individuals were arrested and indicted on one count of illegal assembly or possession of chemicals for the manufacture of drugs (methamphetamine) in violation of R.C. 2925.041(A), a felony of the third degree.  Mr. Salmons' and Mr. Syroid's cases were tried together, and a jury found Mr. Salmons guilty.  Mr. Salmons was sentenced to thirty months of community control.  He has appealed, raising two assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED MR. SALMONS' CRIM.R. 29(A) MOTION FOR JUDGMENT OF ACQUITTAL.  THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR ILLEGAL ASSEMBLY OR POSSESSION OF CHEMICALS FOR MANUFACT[U]RING OF DRUGS.

{¶4}   Mr. Salmons asserts in his first assignment of error that the trial court erred in denying his Crim.R. 29 motion because there was insufficient evidence that Mr. Salmons had the intent to manufacture methamphetamine from the pseudoephedrine pills.  We do not agree.

{¶5}   "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence."  *State v. Slevin*, 9th Dist. Summit No. 25956, 2012-Ohio-2043, ¶ 15.  Whether a conviction is based on sufficient evidence is a question of law that this Court reviews de novo.  *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  The relevant inquiry is whether the State has met its burden of production by presenting sufficient evidence to sustain a conviction.  *Thompkins*, 78 Ohio St.3d at 390 (Cook, J. concurring).  When a defendant challenges sufficiency of the evidence, we do not evaluate credibility; rather, we must:

examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶6}** R.C. 2925.041 provides that:

(A) No person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code.

(B) In a prosecution under this section, it is not necessary to allege or prove that the offender assembled or possessed all chemicals necessary to manufacture a controlled substance in schedule I or II. The assembly or possession of a single chemical that may be used in the manufacture of a controlled substance in schedule I or II, with the intent to manufacture a controlled substance in either schedule, is sufficient to violate this section.

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "'Manufacture' means to plant, cultivate, harvest, process, make, prepare, or otherwise engage in any part of the production of a drug, by propagation, extraction, chemical synthesis, or compounding, or any combination of the same, and includes packaging, repackaging, labeling, and other activities incident to production." R.C. 2925.01(J).

**{¶7}** We note that the trial court instructed the jury that, as a matter of law, methamphetamine is a Schedule II controlled substance. Additionally, a complicity instruction, concerning aiding and abetting, was given. *See* R.C. 2923.03.

{¶8} Lieutenant Brian Simcox of the Akron Police Department and a member of the Clandestine Lab Enforcement Team ("CLET"), whose purpose is to investigate methamphetamine labs in Akron, testified about the manufacture of methamphetamine and the regulation of Sudafed/pseudoephedrine pills.

{¶9} He testified that Sudafed/pseudoephedrine is a necessary ingredient in the manufacture of methamphetamine. Because it is a necessary ingredient, people making methamphetamine used to go into stores and buy lots of pseudoephedrine pills. In order to curtail methamphetamine manufacturing, the government began to regulate pseudoephedrine sales and required that the pills be kept behind pharmacy counters and that purchasers show a driver's license and sign a log book to buy the pills.

{¶10} Today, there is a centralized computer system, NPLEx, that all retailers of Sudafed/pseudoephedrine products are required to use. With NPLEx, police can search for individuals and easily see how much pseudoephedrine someone is buying. However, in March 2013, that system was not yet mandatory. While the Drug Mart on Canton Road had computerized printouts in March 2013, it was not connected to NPLEx, and, if a customer's driver's license would not swipe, the store would still let someone purchase pseudoephedrine pills if the person signed a log book. Lieutenant Simcox testified that Drug Mart was one of the few stores that would let people whose license did not register buy pills. He testified that that Drug Mart had the most Sudafed sales in the area.

{¶11} Because of the high volume of Sudafed sales at the Canton Road Drug Mart and the non-computerized log book, Lieutenant Simcox went to that Drug Mart and began to keep track of the people whose names were regularly appearing in the log book. Ultimately, he gave the names of 10 people who were suspected to be using pseudoephedrine for illegal purposes to

the manager and asked that he be informed whenever one of the listed people tried to buy Sudafed. Mr. Mullet's name was one of the listed names.

{¶12} On March 19, 2013, at 11:40 a.m., Mr. Mullet tried to buy four boxes of pseudoephedrine pills from the Canton Road Drug Mart. However, because that was over the limit, he was only allowed to buy three boxes. As Mr. Mullet's license would not swipe, he had to sign the log book. Upon seeing Mr. Mullet's name, the manager called Lieutenant Simcox and provided Mr. Mullet's description. Lieutenant Simcox contacted Officer James Cunningham who was on patrol in the area of the Canton Road Drug Mart. Officer Cunningham proceeded to the location and observed a vehicle near the front entrance with two males in it. Shortly after, he saw a man matching the description of Mr. Mullet walk out of the Drug Mart and get in the passenger side of the vehicle. Officer Cunningham immediately pulled up to the car and activated his overhead lights. The three people in the car were Mr. Mullet, Mr. Salmons, and Mr. Syroid. Mr. Salmons was the driver of the vehicle. Officer Cunningham relayed the other names to Lieutenant Simcox.

{¶13} Lieutenant Simcox asked Officer Adam Lemonier, also of the CLET, to run Mr. Salmons', Mr. Syroid's, and Mr. Mullet's names through the NPLEx system. Lieutenant Simcox discovered that a short time earlier that same day, "[a]ll three of them had been to the Target approximately 6, 7, 8 miles away on South Arlington Street. Mr. Salmons and Mr. Syroid each bought a box of the pills at the Target. Mr. Mullet attempted but was denied because he was over his limit." The boxes of Sudafed recovered had the bar codes cut off. Those bar codes were found in Mr. Syroid's pocket.

{¶14} Mr. Salmons was interviewed by Lieutenant Simcox about his purchase and about the trio's activities that day. Mr. Salmons told Lieutenant Simcox that he picked up Mr. Syroid

and Mr. Mullet and that they were ultimately going to do a plumbing side job for a woman Mr. Salmons considered to be like a second mother to him. Mr. Salmons indicated that they came to Drug Mart to get some "boxes[,]" which according to Lieutenant Simcox, is slang used by people in "the meth world" for Sudafed. Mr. Salmons indicated on the taped recording admitted into evidence that the three had to go to Drug Mart because he could only buy one box at Target because he was at his limit. Lieutenant Simcox testified that the limit of Sudafed is determined by weight, not boxes. Nonetheless, he believed Mr. Salmons was aware of how much Sudafed one could buy in a day, because the weight of the pills Mr. Salmons purchased was at the daily limit.

{¶15} Initially, Mr. Salmons indicated that one box was for his girlfriend, who was sick, and another was for someone named Shannon. He did not know Shannon's last name but was supposed to meet him somewhere on South Arlington Street. Lieutenant Simcox testified that Mr. Salmons stated he met Shannon in different places. Mr. Salmons indicated on the taped recording that Shannon would pay him the cost of the Sudafed plus $5. This caused Lieutenant Simcox to believe that this was an illegal purchase. He testified that receiving more money than the Sudafed cost along with meeting at different places was an indicator to him that the purchase was illegal. On the taped interview, Mr. Salmons agrees with Lieutenant Simcox's observation that Shannon most likely is going to resell the pills to someone who is going to make methamphetamine. Lieutenant Simcox specifically testified that Mr. Salmons said "that he was buying the pills for Shannon and he believed Shannon would be selling these pills to do something shady or illegal." Lieutenant Simcox testified that he did not know "what else shady you can do with Sudafed pills other than cook meth." Mr. Salmons later states during the recording that it is common sense that Shannon would most likely be reselling the pills to a meth

cook. During the taped interview, Mr. Salmons also explained that Shannon had asked them to cut the bar codes off. Lieutenant Simcox testified that those involved with manufacturing methamphetamine believed that if the bar codes were cut off, police would be unable to track the purchases to specific people or stores. Finally, Mr. Salmons also offered to find out the name of the methamphetamine cook and said he could do so if he was allowed to go through with the transaction with Shannon.

{¶16} Additionally, while not testified about extensively, the State admitted State's Exhibit 9, which was a print out of Mr. Salmons' purchases of pseudoephedrine, which included a purchase on March 19, 2013, from the Target on Arlington Road. That sheet also indicates that from June 12, 2012, through March 19, 2013, Mr. Salmons purchased 14 boxes of pseudoephedrine pills and that three additional purchases were blocked in that timeframe.

{¶17} Based upon all the foregoing evidence, we conclude that there was sufficient evidence, when viewed in a light most favorable to the prosecution, whereby a trier of fact could conclude that Mr. Salmons violated R.C. 2925.041(A), particularly given that the jury was instructed on complicity.

{¶18} "[A] defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity." *State v. Herring,* 94 Ohio St.3d 246, 251 (2002), quoting R.C. 2923.03(F); *see also State v. White,* 9th Dist. Summit Nos. 23955, 23959, 2008-Ohio-2432, ¶ 28.

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*State v. Johnson,* 93 Ohio St.3d 240 (2001), syllabus; *see also White* at ¶ 29.

{¶19} There is no dispute that Mr. Salmons purchased pseudoephedrine pills from Target on March 19, 2013, and there is no dispute that pseudoephedrine pills are used in the manufacture of methamphetamine, a Schedule II controlled substance. The only dispute is whether Mr. Salmons had the intent that the pseudoephedrine pills be used to manufacture methamphetamine. Based upon the evidence presented, we conclude that Mr. Salmons' Crim.R. 29 motion was properly denied.

{¶20} We conclude there was sufficient evidence, if believed, that Mr. Salmons possessed the pseudoephedrine pills with intent that they would be manufactured into methamphetamine by someone else. There was evidence that he was aware that pseudoephedrine was used to make methamphetamine, that it was regulated, and that you could only buy so much of it in a certain timeframe. He also knew the slang term for pseudoephedrine pills used by people involved with methamphetamine. There was evidence that Mr. Salmons bought the pills to resell to someone he knew only as "Shannon" for a profit. He knew that Shannon wanted the bar codes cut off the boxes. Additionally, there was testimony that Mr. Salmons bought the pills knowing that more than likely they would be resold to someone who would use them to manufacture methamphetamine or do something else shady with them. Lieutenant Simcox testified he could think of nothing else shady one would do with pseudoephedrine pills other than manufacture methamphetamine. Moreover, Mr. Salmons believed that he could find out the name of the methamphetamine cook, if it would help him, further supporting the conclusion that Mr. Salmons knew that the pills would be used to manufacture methamphetamine. And while less probative of Mr. Salmons' intent, it is notable that Mr. Salmons was found in a vehicle with a person on a pseudoephedrine watch list and that

Mr. Salmons himself had purchased a number of boxes of pseudoephedrine in the year prior to his arrest. Viewing the evidence in a light most favorable to the prosecution, the testimony reveals that Mr. Salmons knowingly possessed or assembled pseudoephedrine pills with the intent they be used to manufacture methamphetamine. *See White* at ¶ 30 ("Consequently, even if White did not manufacture the methamphetamine herself, the record supports the conclusion that she obtained the materials necessary to aid or abet another in its production. The jury did not lose its way in convicting White of both illegal manufacturing and illegal possession."); *see also State v. Ruddock,* 5th Dist. Licking No. 11-CA-94, 2012-Ohio-2711, ¶ 27-28 (concluding appellant's conviction for illegal assembly was based upon sufficient evidence where appellant bought pseudoephedrine for the purpose of trading the pills for methamphetamine knowing that they would be used to manufacture more methamphetamine). Therefore, we overrule Mr. Salmons' first assignment of error.

ASSIGNMENT OF ERROR II

> MR. SALMONS' CONVICTION FOR ILLEGAL ASSEMBLY OR POSSESSION OF CHEMICALS FOR MANUFACTURING OF DRUGS IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶21} Mr. Salmons asserts in his second assignment of error that his conviction is against the manifest weight of the evidence. We do not agree.

{¶22} In reviewing a challenge to the weight of the evidence, the appellate court

> [m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶23} Notably, Mr. Salmons has not clearly developed a separate manifest weight argument; instead, he has combined his argument concerning sufficiency with his argument concerning manifest weight. *See* App.R. 16(A)(7). Much of Mr. Salmons' argument focuses on whether there was a complete lack of evidence to support an element, a sufficiency issue. Mr. Salmons' limited manifest weight argument appears to be that, because there were other plausible explanations about his intentions concerning the use of the pseudoephedrine pills, his conviction is against the manifest weight of the evidence.

{¶24} Mr. Salmons provided Lieutenant Simcox with multiple explanations as to why he bought the pills. It is true that Mr. Salmons indicated that one box was for his girlfriend. Nonetheless, he also stated that he and the others were buying boxes for Shannon and selling them to him for a profit and that ultimately it was likely the pills would be used for something shady. Mr. Salmons also agreed that he was buying the pills for a meth cook. During the taped interview, Mr. Salmons asserted that he had no part in any illegality. Ultimately, the jury was required to weigh the evidence and assess the credibility of the witnesses when deciding Mr. Salmons' intent. To the extent that it did not accept Mr. Salmons' explanations as to why he purchased the pseudoephedrine pills, we cannot say its credibility resolution was unreasonable and against the manifest weight of the evidence.

{¶25} After carefully reviewing and considering the entire record, and in light of Mr. Salmons' limited argument, we cannot say that the jury lost its way in concluding that Mr. Salmons violated R.C. 2925.041(A). Mr. Salmons' second assignment of error is overruled.

III.

{¶26} In light of the foregoing, we overrule Mr. Salmons' assignments of error and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

HENSAL, J.
CARR, J.
CONCUR.

APPEARANCES:

BRIAN M. ASHTON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.